643 A.2d 564

PAUL CALDWELL, PLAINTIFF–RESPONDENT, v. DELORIS HAYNES, DEFENDANT, AND TODD KEHLER AND ALICE S. KEHLER, DEFENDANTS–APPELLANTS.

Argued March 14, 1994—Decided July 6, 1994.

424

*W. Stephen Leary* argued the cause for appellants (*Leary Bride, Tinker & Moran,* attorneys).

*Raymond T. Roche* argued the cause for respondent (*Roche & Carter,* attorneys; *Mr. Roche* and *M. Roy Oake,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

Plaintiff was injured while seated in a disabled car on the Pulaski Skyway when the car was struck in the rear by defendants' car. Plaintiff suffered back injuries, for which he sued the Kehlers and Deloris Haynes, the owner of the disabled car. He also brought a separate action, which was later consolidated, against the personal injury protection ("PIP") insurance carrier.

The jury found Todd Kehler 100% liable and awarded damages based on lost past wages, lost future income, and pain and suffering. However, the trial court, finding the damages award to be excessive, granted Kehler's motion for a new trial on damages only. The Appellate Division, in an unreported opinion, agreed with the trial court that the past-lost-income award was excessive

but upheld the jury verdicts for future lost income as well as pain and suffering.

We granted Todd Kehler's petition for certification, 134 *N.J.* 559, 636 *A.*2d 518 (1993), which challenged the Appellate Division's refusal to set aside the damages award in its entirety.

I

On May 21, 1987, Todd Kehler (hereinafter defendant), who was operating a car owned by Alice Kehler, struck the rear end of a disabled vehicle at or near the shoulder of the Pulaski Skyway. The disabled car had stalled in the right lane of the roadway and its owner, co-defendant Deloris Haynes, had left the car to seek help. Plaintiff, Paul Caldwell, who remained in the disabled vehicle, was injured by the impact. He sued the Kehlers, Haynes, and, in a separate action that was later consolidated, State Farm Insurance Company, the PIP carrier.

Caldwell, who was thirty-five-years-old at the time of the accident, was examined and treated over the years by various doctors and hospitals. For almost a year after the May 1987 accident, Caldwell continued treatment with Dr. Sherman, a board-certified internist, who initially treated Caldwell for a spasm, tenderness, and a reduced range of motion in his back. Despite Caldwell's treatment, he remained in pain. Eventually, Dr. Sherman suspected the "possibility of tuberculosis of the spine." Dr. Sherman testified that in his opinion "the accident unmasked or reactivated latent tuberculosis" because he could find no other provoking factors, and medical literature indicated that "significant auto trauma can be a provoking factor."

Later, Caldwell began treatment with Dr. Lee, an orthopedic surgeon. In late 1990, Dr. Lee admitted Caldwell to the hospital because Caldwell was still experiencing back pain and his "right leg was still getting numb every now and then." Caldwell testified that Dr. Lee told him he had tuberculosis of the spine. Dr. Lee's discharge summary indicated the final diagnosis as post-traumatic lumbosacral sprain with spasms, psoas abscess with multiple lum-

bar abscesses, suspected tuberculosis, and osteomyelitis with destruction of certain vertebrae. Apparently, Dr. Lee's antibiotic treatment of Caldwell ended the progress of the disease. No evidence suggested that further destruction of spinal bone or other increase in disability had occurred or would occur in the future.

However, according to defendant's expert, Dr. William Burke, the automobile impact was not severe enough to cause the tuberculosis to spread; and because the appearance of tuberculosis in the spine had been diagnosed so much later, it was improbable that the tuberculosis was related to the accident, if that was indeed a correct diagnosis of plaintiff's condition.

Caldwell testified that his back pain was "sharp," he was "in constant pain every day," and "everything became a problem," including tying his shoes, walking, and driving. Caldwell denied ever having had any back pain before the accident.

Before the accident, plaintiff had been employed for two to three years as a general laborer by a construction company that repaired bridges and tunnels. At the time of the accident, Caldwell earned $25.65 per hour and worked forty or forty-five hours per week, although his hours varied, seemingly due to the seasonal nature of the work. After the accident Caldwell missed three months of work.

Caldwell testified that at the construction company he earned an average gross weekly income of about $1,000. His testimony suggested that his pre-accident annual salary before taxes had been about $44,000. Caldwell stated that in 1987, the year of the accident in which he missed three months of work, he had earned $33,000. However, Caldwell estimated that his gross wages for the previous year in his work for the same company were only "twenty something" thousand.

After the accident and the three-month absence, Caldwell continued working for the company, with lighter work assignments but at the same salary, until July 1990, more than three years

after the accident. In July 1990, the company discharged Caldwell. Caldwell testified that he had been fired because he could no longer "do the strenuous work that it would take to do ... the lifting, and other things like that." Caldwell also stated that "[b]eing terminated with a construction company means you can be fired one day and back at work the next day just because, you know ... [t]here's quite a few they would fire one week, hire back the next week. So I was just one of them." That was the first time the company fired Caldwell. He did not seek to be rehired.

Caldwell remained unemployed for a period of eighteen or nineteen months. In February or March 1992, he found work driving a senior citizens' van twenty hours a week at $5.50 per hour. At the time of trial, Caldwell was earning a little over $6,000 per year. He said he was capable of driving a full week, but the job offered only twenty hours. Thus, in addition to the initial three-month absence from work, Caldwell missed eighteen or nineteen months between the construction and the driving job. Then, he worked part-time during a five- or six-month period during which he had the twenty-hour-per-week driving job.

As noted, the court consolidated the PIP and personal-injury claims for trial. On the personal-injury claim, the trial court instructed the jury to calculate Caldwell's lost income based on his net income after taxes. With respect to future lost income, the trial court did not instruct the jury about present value or work-life expectancy.

Ultimately, the jury found defendant Todd Kehler 100% liable and awarded Caldwell a total of $1,950,000: $200,000 for past lost wages, $1.5 million for future lost wages, and $250,000 for pain and suffering. The owner of the car in which plaintiff had been sitting, co-defendant Haynes, and the owner of the car in which Todd Kehler had been driving, co-defendant Alice Kehler, were cleared of responsibility.

Defendant Todd Kehler moved for a new trial on both liability and damages. The trial court affirmed the liability finding, but ordered a new trial on damages. It stated: "I don't know what

was going on in this jury's mind at all but it certainly was not anything approaching a coherent evaluation of the case before it." The court had "never seen a case that's clearer than this of excessive damages; totally irrational on its face and it obviously shocks the conscience of the Court."

Specifically, the trial court found the jury's award of $200,000 for past lost wages improper because "plaintiff's counsel had properly admitted that at most the plaintiff was out of work for two years, three months and three weeks plus or minus." Therefore, the trial court found that if Caldwell's net income was $720 (based on Caldwell's testimony that he earned $1,000 gross weekly income), $200,000 for five years "would require that the plaintiff not have worked a day for those five years ... [, which was] obviously inconsistent with the testimony."

The trial court determined the future-lost-wages award similarly flawed. It noted that the jury would have to have used gross income and to have concluded that plaintiff would work steadily without a break until reaching eighty-years of age.

The trial court also stated that the pain-and-suffering award of $250,000 "shock[ed] the conscience of the [c]ourt in relation to the testimony." The trial court rejected the option of separating and sustaining the damages for pain and suffering because with "the other damage awards ... so alien to the evidence," it had "no confidence in setting the damages for pain and suffering." The trial court refused to grant a remittitur.

The Appellate Division granted both Caldwell and the Kehlers leave to appeal the interlocutory order. On appeal, plaintiff sought reinstatement of the jury's entire damages award, and defendants sought an order for a new trial on liability as well as damages. The Appellate Division partially affirmed and partially reversed the trial court judgment. It affirmed the trial court's denial of a new trial on liability because the evidence provided a reasonable basis on which the jury could conclude that Todd Kehler was 100% liable. That no longer poses an issue on appeal.

The Appellate Division also affirmed the trial court's order for a new trial on damages but only with respect to *past* lost income. The Appellate Division noted that although the trial court had properly instructed the jury that Caldwell's lost income was to be based on his net income after taxes, "[e]xactly how the jury was to perform the calculation is hard to imagine, since there was no information in the evidence before [it] to equip [it] to do so." Based on its calculations derived from Caldwell's testimony of his past earnings, the Appellate Division concluded that the $200,000 award for a maximum of two years and three months of lost time to the date of trial was "almost twice what any calculation accepting plaintiff's biggest numbers would produce."

However, the Appellate Division reversed the trial court's grant of a new trial relating to the $1.5 million future-lost-income award and the $250,000 pain-and-suffering award, noting that a "sympathetic view of plaintiff's condition for the nearly forty years of his expected life from the date of the accident would clearly justify such a verdict."

The Appellate Division further ordered that plaintiff be offered the choice of either a new trial on past lost income or entry of judgment for the reduced amount of $1,750,000 (plus interest), "which would constitute an abandonment of the claim as to which the new trial was ordered." It concluded that except for the past-lost-wages award, the jury verdict indicated an acceptance of Caldwell's version of the accident and resultant injuries: "Neither the surprising size of the verdicts, nor the fact that they demonstrated a sympathetic and total acceptance of Caldwell's evidence makes them unjust or reversible."

## II

A trial court may order a new trial when, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1. A trial court should set aside excessive verdicts only in "clear

cases." *Fritsche v. Westinghouse Elec. Corp.*, 55 *N.J.* 322, 330, 261 *A.*2d 657 (1970). In assessing whether the quantum of damages assessed by the jury is excessive, a trial court must consider the evidence in the light most favorable to the prevailing party in the verdict. *Taweel v. Starn's Shoprite Supermarket*, 58 *N.J.* 227, 236, 276 *A.*2d 861 (1971); *see Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 597, 379 *A.*2d 225 (1977) (holding that trial court's findings of fact entitled to respect). Therefore, a trial court should not interfere with a jury verdict unless the verdict is clearly against the weight of the evidence. *Horn v. Village Supermarkets, Inc.*, 260 *N.J.Super.* 165, 178, 615 *A.*2d 663 (App. Div.1992), *certif. denied*, 133 *N.J.* 435, 627 *A.*2d 1141 (1993). The verdict must shock the judicial conscience. *Carey v. Lovett*, 132 *N.J.* 44, 66, 622 *A.*2d 1279 (1993).

■ In reviewing a trial court's ruling on a motion for a new trial, an appellate court shall not reverse a trial court "unless it clearly appears that there was a miscarriage of justice under the law." *R.* 2:10–1. Accordingly, "The standard for appellate review of a trial court's decision on a motion for a new trial is substantially the same as that controlling the trial court except that due deference should be made to its 'feel of the case,' including credibility." *Feldman v. Lederle Lab.*, 97 *N.J.* 429, 463, 479 *A.*2d 374 (1984) (quoting *Dolson v. Anastasia*, 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969)). At the same time, a trial court's determination is "not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which he is no more peculiarly situated to decide than the appellate court." *Dolson, supra*, 55 *N.J.* at 7, 258 *A.*2d 706.

■ In this case, the trial court's granting of the motion for a new trial does not appear to have rested on the worth or plausibility of evidence or the credibility or demeanor of witnesses or other intangible factors not clearly reflected in the record. *Ibid.* Rather, the trial court granted the new trial based on the illogical mathematical calculations of the lost-wages awards. Similarly, the

trial court's criticism of the pain-and-suffering award was based on its characterization of the evidence that the testimony relating to that aspect of damages disclosed "occasional problems from time to time." That observation does not indicate clearly or even suggest any reliance on considerations within the "peculiar" knowledge of the trial court. *See ibid.* Therefore, this Court may review for excessiveness the jury's awards based on an independent review of the record.

## III

The principal goal of damages in personal-injury actions is to compensate fairly the injured party. *Deemer v. Silk City Textile Mach. Co.,* 193 *N.J.Super.* 643, 651, 475 *A.*2d 648 (App.Div. 1984). Fair compensatory damages resulting from the tortious infliction of injury encompass no more than the amount that will make the plaintiff whole, that is, the actual loss. *Ruff v. Weintraub,* 105 *N.J.* 233, 238, 519 *A.*2d 1384 (1987). "The purpose, then[,] of personal injury compensation is neither to reward the plaintiff, nor to punish the defendant, but to replace plaintiff's losses." *Domeracki v. Humble Oil & Ref. Co.,* 443 *F.*2d 1245, 1250 (3d Cir.), *cert. denied,* 404 *U.S.* 883, 92 *S.Ct.* 212, 30 *L.Ed.*2d 165 (1971).

## A.

An injured party has the right to be compensated for diminished earning capacity. *Smith v. Red Top Taxicab Corp.,* 111 *N.J.L.* 439, 443, 168 *A.* 796 (E. & A.1933). The measure of damages for tort recovery encompassing diminished earning capacity can be based on the wages lost as a result of the defendant's wrongdoing. *Ibid.* That measure includes the value of the decrease in the plaintiff's future earning capacity. *Coll v. Sherry,* 29 *N.J.* 166, 176, 148 *A.*2d 481 (1959) (holding that plaintiff has right to be compensated for any future earnings that will probably be lost as result of injuries caused by defendant's wrongdoing). When the effects of injury will extend into the future, "the plaintiff

is entitled to further compensation—for [the] capacity to earn in the future has been taken from [the plaintiff], either in whole or in part." Robert J. Nordstrom, *Income Taxes and Personal Injury Awards*, 19 *Ohio St.L.J.* 213, 217 (1958).

However, the evaluation of such a decrease in future earning capacity is necessarily complicated by the uncertainties of the future. Because resort to future wages serves only as a measure or indicator of lost earning capacity, those wages must be calculated to reflect as nearly as possible actual earnings. *See Tenore v. Nu Car Carriers, Inc.*, 67 *N.J.* 466, 494, 341 *A.*2d 613 (1975). Hence, the "proper measure of damages for lost income in personal-injury cases is net income after taxes." *Ruff, supra,* 105 *N.J.* at 238, 519 *A.*2d 1384.

The net-income rule embodies the principle that "damages in personal-injury actions should reflect, as closely as possible, the plaintiff's actual loss." *Ibid.; see Tenore, supra,* 67 *N.J.* at 477, 341 *A.*2d 613. Hence, "If plaintiff gets, in tax-free damages, an amount on which he would have had to pay taxes if he had gotten it as wages, then plaintiff is getting more than he lost." 4 Fowler V. Harper et al., *The Law of Torts* § 25.12 (2d ed. 1986); *see Ruff, supra,* 105 *N.J.* at 238, 519 *A.*2d 1384. The measurement of after-tax income is the "more accurate, and therefore proper, measure of damages," *Ruff, supra,* 105 *N.J.* at 241, 519 *A.*2d 1384, because personal-injury damage awards are subject to neither federal nor state taxes. 26 *U.S.C.* § 104(a)(2); *N.J.S.A.* 54A:6–6. *See generally* Annotation, John E. Theuman, *Propriety of Taking Income Tax into Consideration in Fixing Damages in Personal Injury or Death Action,* 16 *A.L.R.*4th 589, 611 (1982 & Supp.1993) (reviewing courts' treatment of income-tax liability in personal-injury actions). For that reason, courts instruct juries that an award for damages is not taxable. *See Bussell v. DeWalt Prods. Corp.,* 105 *N.J.* 223, 229, 519 *A.*2d 1379 (1987).

In this case, the jury apparently based its future-lost-income award of $1.5 million only on Caldwell's gross income, given that neither plaintiff nor defendants presented any evidence of net

income. The Appellate Division observed that the jury probably had calculated the future lost wages award by multiplying the gross income figure of $1,000 per week by the number of weeks of Caldwell's life expectancy. The court below surmised that the jury "may have reasonably concluded that plaintiff used to make $1,000 per week but, despite his demonstrated desire to work steadily and hard, he was now doomed to jobs paying no more than his current earnings of $120 per week for the rest of his life."

Despite the absence of evidence of plaintiff's net income, the trial court instructed the jury to use net income as the measure of lost wages. Nevertheless, the jury seemingly did not attempt to ascertain or apply net income in its calculations as a matter of common sense and ordinary experience even in the absence of evidence of net income. See *Lesniak v. County of Bergen*, 117 *N.J.* 12, 28–29, 563 *A.*2d 795 (1989) (ruling that based on jury's "common sense and experience," future-income-earning potential for injured infant allowed despite uncertainty). The Appellate Division speculated that "[t]he jury was supposed to award only lost net earnings, [but it] . . . may well have given up the effort to do so in the absence of the smallest shred of information on the subject of taxes."

Plaintiff responds that when a defendant does not challenge plaintiff's evidence of gross income, a defendant may be liable for damages for lost wages based on *gross* income. The Appellate Division noted that under current law, "[i]f the parties do not take the opportunity to produce [net-income evidence], they may have to live with their disappointment if the jury does not supply the information out of their own common knowledge." Consequently, notwithstanding its finding that "this jury was as uninformed and unguided as any jury considering a potentially heavy case could be," the appellate court reversed the trial court's order for a new trial on lost future income.

Under our law, as the Appellate Division correctly observed, neither party actually has the burden to provide net-income evidence for a claim based on lost wages. The current practice in

terms of the burden of proof is rather loose. Thus, either party is permitted, but not required, to introduce evidence of a plaintiff's income tax obligation. *Ruff, supra*, 105 *N.J.* at 241–42, 519 *A.*2d 1384 ("[P]arties may introduce evidence and cross-examine witnesses with regard to plaintiff's future tax liability.").

■ This case exemplifies the uncertainties and confusion that surround the current practice with respect to proving damages for diminished earning capacity based on lost income and the relevance of net earnings as an element of that proof. We are convinced that the practice should be clarified and modified. To ensure that juries have sufficient evidence to use net income in their determination of damages, we now hold that in personal-injury and wrongful-death actions, a plaintiff has the burden of proving net income when seeking recovery for diminished earning capacity based on lost wages.

■ Generally, plaintiffs have the burden of proving damages. *See, e.g., Lane v. Oil Delivery, Inc.*, 216 *N.J.Super.* 413, 420, 524 *A.*2d 405 (App.Div.1987) ("It is ... sufficient that the plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate."); *Huddell v. Levin*, 537 *F.*2d 726, 743 (3d Cir.1976) ("The plaintiff ... bears the burden of proof and it is the responsibility of the plaintiff to provide for the jury some evidentiary and logical basis for calculating or, at least, rationally estimating a compensatory award."); *Caputo v. United States*, 157 *F.Supp.* 568, 569 (D.N.J.1957) ("The burden rests upon the plaintiff to prove ... damages ... by the preponderance of the evidence.").

However, in practice, plaintiffs often shun and defendants tend to assume the "permissive" burden of presenting net-income evidence in establishing lost wages. *See Ruff, supra*, 105 *N.J.* at 238, 519 *A.*2d 1384 ("[E]vidence of the plaintiff's future tax liability may be introduced by the defendant."); *Tenore, supra*, 67 *N.J.* at 484, 341 *A.*2d 613 (holding that in wrongful-death case "fairness requires that defendant have an opportunity to introduce evidence

of deceased's tax liability"); Nordstrom, *supra*, 19 *Ohio St.L.J.* at 212 (noting that defense attorneys seek to introduce plaintiffs' tax liabilities to reduce final awards). Plaintiffs have an incentive to withhold such evidence to exaggerate their actual or real earnings. Defendants seek to elicit such evidence because they generally benefit when a jury excludes income taxes from lost-wages awards. Randall G. Vaughan, Note, *Tax Issues of Personal Injury and Wrongful Death Awards*, 19 *Tulsa L.J.* 702, 709 (1984) ("Plaintiffs introduce gross earnings evidence as the basis for calculation of damages while defendants attempt to prove that the actual 'take home' salary would have been much less because of tax liabilities.").

To rectify the uncertainties that surround the application of the net-income-evidence rule and the confusion that arises from the unstructured current practice, the burden of proving net income in personal-injury and wrongful-death actions should be placed clearly and squarely on the plaintiff. In so doing, we note that such a burden on the plaintiff should not be difficult to sustain because he or she should have easy access to proof of net income. Most of that evidence, such as pay stubs or tax returns, is readily at hand and will not involve complicated calculations.

The plaintiff in such actions can more easily establish the amount of taxes paid on gross income than can the defendant. *See, e.g., J.E. ex rel. G.E. v. State*, 131 *N.J.* 552, 569, 622 *A.*2d 227 (1993) ("We generally have imposed the burdens of persuasion and production on the party best able to satisfy those burdens."); *Lascari v. Board of Educ.*, 116 *N.J.* 30, 45, 560 *A.*2d 1180 (1989) ("[B]urdens of persuasion and of production should be placed on the party better able to meet those burdens."). Imposing the burden on the plaintiff coincides with the plaintiff's responsibility at trial to prove that damages are ascertainable. Charles T. McCormick, *Damages* § 14 (1935) (noting that "plaintiff has the burden of proving ... loss or damage"); *see, e.g., Lane, supra*, 216 *N.J.Super.* at 420, 524 *A.*2d 405; *Huddell, supra*, 537 *F.*2d at 743; *Caputo, supra*, 157 *F.Supp.* at 569. More important, such an

allocation of the burden of proof ensures that the jury has the net-income evidence needed to perform its duties and reduce the risk of speculative awards. *See Ruff, supra,* 105 *N.J.* at 240 (noting that "some testimony on the plaintiff's future tax liability will be necessary"); *see also Goodman v. Fairlawn Garden Assocs.,* 253 *N.J.Super.* 299, 306 (App.Div.) (ruling harmful error where no evidence introduced about issue on which jury was instructed), *certif. denied,* 130 *N.J.* 7, 611 *A.*2d 647 (1992). Therefore, even if a defendant's trial strategy may be to avoid the entire issue of net income by refusing to elicit such evidence in an effort to weaken the plaintiff's liability claims, which arguably happened in this case, a jury will "be enabled to make an informed estimate" under a rule that requires the production of net income evidence. *See Tenore, supra,* 67 *N.J.* at 494, 341 *A.*2d 613.

In this case, neither party assumed the proper burden of proof; neither presented the jury with evidence of plaintiff's net income. The deficiencies in the evidence led the jury to reach exaggerated awards for both past and future income. In addition, even plaintiff's evidence of his *gross* income was, at best, inconsistent. As the trial court observed, "There was some contradiction as to what his yearly [gross] income was." As noted, Caldwell testified that his pre-accident annual salary before taxes had been about $44,000, but also stated that he had earned only "twenty something" thousand the year before the accident in the same job. The Appellate Division observed that "no one asked him why that year's figure was so low."

With respect to Caldwell's claim based on past lost income, the Appellate Division calculated that Caldwell had grossed $1,000 per week, and had lost twenty-seven months or 117 weeks of work. At $1,000 per week, a figure that somewhat overstated Caldwell's actual earnings in 1986 and 1987 based on Caldwell's annual salary, Caldwell's gross earnings would have been $117,000, less about $2,640 for twenty-two weeks at $120 as a van driver, for a loss to the date of trial of $114,360. As the trial court noted, the jury awarded plaintiff more than double what he could have

earned, even if gross income were the standard. *See Hudgins v. Serrano,* 186 *N.J.Super.* 465, 481, 453 *A.*2d 218 (App.Div.1982) (ruling that jury verdict on wages that was close to twice plaintiff's actual loss constituted manifest injustice). Thus, the lack of net-income evidence clearly influenced the jury's past-lost-wages award.

With respect to future lost wages the verdict obviously was also distorted by evidence that was limited to gross income. In a fifty-week year, Caldwell would lose gross earnings of $880 per week or $44,000 per year. The Appellate Division surmised that the jury had multiplied Caldwell's life expectancy of 34.55 years by the $44,000 in lost gross earnings to arrive at $1,520,000, which was rounded down to $1,500,000. The trial court reasoned that that award contemplated plaintiff working for 2,083 straight weeks without vacation, or over forty years until the age of eighty, again based on defendant's gross, not net, income.

A verdict based on evidence of net income would clearly have brought the jury to a different result. Assuming the Appellate Division's hypothesis was correct, the jury simply multiplied Caldwell's gross income by his life expectancy to reach an award of $1.5 million. Accepting Caldwell's testimony that he had earned $1,000 in gross weekly income, and assuming federal and state tax liability to be 28%, his after-tax income would have been $720. Plaintiff was forty-years-old at the date of the verdict. If the net income figure were multiplied by Caldwell's life expectancy of 34.55 years, even assuming plaintiff worked all fifty-two weeks a year, at most the verdict would approximate $1,290,000. Furthermore, if the jury had based its calculations using work-life expectancy, twenty-five years, again assuming plaintiff worked fifty-two weeks a year, his future lost wages based on net income would equal $936,000 ($37,440 net annual income multiplied by twenty-five years). Moreover, the income award would have been reduced even further based on plaintiff's earnings as a van driver.

We conclude that the damages awards based on lost income, past and future, were clearly excessive and must be set aside. We

therefore remand for a retrial of those damages. The burden of proof should be borne by Caldwell in the new trial to establish net income as a basis for damages measured by both claimed lost past and lost future income.

### B.

Defendant also contends that with respect to future earnings, the trial court committed reversible error because it did not instruct the jury to discount the award for future lost income to establish its present or current value or to base its determination of future lost income on plaintiff's work-life, as opposed to life, expectancy. On remand, the trial court should correct those errors.

In ordering a new trial on damages, the trial court commented that it did not charge the jury on present value because "[n]obody asked for it" and "[n]obody thought it necessary." Similarly, the Appellate Division noted that "no one said anything to the jury about discounting future earnings, or about the effects of inflation, or about plaintiff's chances of promotion or raises, or about the concept of work-life expectancy (except a passing reference in plaintiff's attorney's summation), or about the likelihood that plaintiff's construction work might be seasonal and not likely to produce a fifty-week work year."

A defendant is "entitled to have the [economic-damages] recovery discounted to present value, a procedure [that] recognizes that the deceased [or injured party] would have had his income spread out over the remaining years of his working life." *Tenore, supra,* 67 *N.J.* at 474, 341 *A.2d* 613; *see also Glowacki v. Underwood Memorial Hosp.,* 270 *N.J.Super.* 1, 16, 636 *A.2d* 527 (App.Div.1994) (finding that trial court properly instructed jury on future lost wages "to account for inflation and present value"); *McKenna v. Pacific Rail Serv.,* 817 *F.Supp.* 498, 516 (D.N.J.1993) (stating that *Ruff* "made clear that proper measure of damages is net income after taxes ... discounted to present value"). Similarly, we have recognized that "in wrongful death actions, the jury

should be instructed that it is permissible for [it] to consider the impact of inflation upon the survivor's future losses." *Tenore, supra*, 67 *N.J.* at 481, 341 *A.*2d 613. Thus, the Model Civil Jury Instructions provide for discounting awards to reflect their present value and considering the effects of inflation and interest. *Model Jury Instructions (Civil)*, Loss of Earnings § 6.11D (May 1990).

Seemingly, the jury also mistakenly based its future-lost-income award on Caldwell's life expectancy (34.55 years), not work-life expectancy (arguably twenty-five years). As the Appellate Division hypothesized, the jury probably used Caldwell's life-expectancy years in its calculations because it was provided on the verdict sheet. A jury should consider a plaintiff's work-life expectancy as well as life expectancy in determining future lost income "if there is appropriate evidence received on the subject." *Ibid.* Accordingly, the jury should have been instructed regarding work-life as well as life expectancy to guide its deliberations on future lost income.

C.

In summary, we affirm the trial court's order to conduct a new trial on damages for diminished earning capacity based on lost income. We hold that plaintiffs in personal-injury and wrongful-death actions bear the burden of proving net income, and we rule in this case that that burden of proof shall be applied on remand. In addition, we direct that the trial court instruct the jury with respect to the relevance of work-life expectancy in the calculation of an award based on future lost income and the determination of the present or current value of such an award.

IV

Defendant also argues that the Appellate Division improperly upheld the jury's pain-and-suffering verdict. We agree.

■ Assigning a monetary value to pain-and-suffering compensation is difficult because that kind of harm is "not gauged by any established graduated scale." *Cermak v. Hertz Corp.*, 53 *N.J.Super.* 455, 465, 147 *A.*2d 800 (App.Div.1958), *aff'd*, 28 *N.J.* 568, 147 *A.*2d 795 (1959); *accord Glowacki, supra*, 270 *N.J.Super.* at 15, 636 *A.*2d 527. Nevertheless, pain-and-suffering awards must be reviewed to determine whether they are "fair and reasonable." *Botta v. Brunner*, 26 *N.J.* 82, 92, 138 *A.*2d 713 (1958); *see Lewis v. Read*, 80 *N.J.Super.* 148, 175, 193 *A.*2d 255 (App.Div.), *certif. denied*, 41 *N.J.* 121, 195 *A.*2d 17 (1963). "The law abhors damages based on mere speculation." *Lewis, supra*, 80 *N.J.Super.* at 174, 193 *A.*2d 255.

The trial court found that the pain-and-suffering award could not be separated "from the other damages and be sustained." However, the Appellate Division found that "[a] sympathetic view of plaintiff's condition for the nearly forty years of his expected life from the date of the accident would clearly justify such a verdict." Apparently, defendant and the trial court "expressed skepticism [that] the jury did not share."

That personal-injury awards are not generally divisible is well established. Dan B. Dobbs, *Remedies* § 8.1 (1973) (noting that personal-injury awards, which include lost earning capacity, medical expenses, and pain and suffering, comprise lump sum); McCormick, *supra*, § 16 ("[T]he customary form of general verdict [for damages] when the plaintiff is successful is a simple statement ... to the effect that the jury finds for the plaintiff and assesses his damages at a [lump] sum named.").

■ In this case, we agree with the trial court. We cannot conclude in the context of all of the evidence relating to damages that the excessive lost wages awards are "fairly separable" from the pain-and-suffering award. *See Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.*, 18 *N.J.* 294, 341, 113 *A.*2d 787 (1955). Although the trial errors related only to past and future lost income, the excessiveness of those awards and the "interrelationship of the various items of

plaintiffs' claim undermine[ ] the continued reliability of the separate awards," including that of pain and suffering. *Ruff, supra,* 105 *N.J.* at 243, 519 *A.*2d 1384. Therefore, we reverse the Appellate Division's judgment that reinstated the jury's $250,000 verdict on pain and suffering.

## V

We remand for a new trial on damages only. On remand we encourage the trial court to consider a motion for remittitur under *Rule* 4:49–1. *See Ruff, supra,* 105 *N.J.* at 243, 519 *A.*2d 1384.

Remittitur denies a defendant a new-trial motion on the condition that a plaintiff consent to a specified reduction in the jury's award. *Henker v. Preybylowski,* 216 *N.J.Super.* 513, 516, 524 *A.*2d 455 (App.Div.1987). The practice of remittitur is encouraged at both trial and appellate levels in cases involving excessive damages. *Baxter, supra,* 74 *N.J.* at 595, 379 *A.*2d 225; *Fritsche, supra,* 55 *N.J.* at 330–31, 261 *A.*2d 657. The practice "gives plaintiff the choices of accepting the reduced verdict or suffering a new trial on damages." *Mulkerin v. Somerset Tire Serv., Inc.,* 110 *N.J.Super.* 173, 176, 264 *A.*2d 748 (App.Div.1970); *see Taweel, supra,* 58 *N.J.* at 231, 276 *A.*2d 861. However, the practice is available if the only issue is the quantum of damages, the claimant's right to relief is clear, and "the verdict was not the result of compromise or otherwise tainted." Sylvia B. Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 4:49–1 (1994).

In this case, the Appellate Division appropriately has made remittitur available. However, its proposed remittitur must be modified in light of our determination that the damages in their entirety are subject to a new trial. Thus, the remittitur on remand should offer the choice of a reduction of damages *or* a new trial on *all* damages. *See, e.g., Hudgins, supra,* 186 *N.J.Super.* at 479–83, 453 *A.*2d 218 (upholding pain-and-suffering award of $7,500, but finding lost-wages award of $1,150,000 shocking because evidence supported lost-wages award of $650,000 only; granting plaintiff remittitur for *all* damages not to exceed $750,000

or a new trial on damages only). In addressing the feasibility of a remittitur, the trial court should take into account the jury's determination to view plaintiff's claims sympathetically and to credit plaintiff's testimony with respect to damages and the ability of the parties to proffer competent evidence relating to such matters as net income, work-life expectancy, and the current value of any awards based on future losses. Those considerations indicate that the trial court should be able to determine a realistic and fair calculation of damages as a basis for an order of remittitur.

## VI

We reverse the Appellate Division's judgment, except for its ruling on past lost wages, and remand to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.