**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0849-23

MELANIE ALVERIO, as
Administrator ad Prosequendum
of the ESTATE OF SANTOS
ALVERIO, JR., deceased,
on behalf of the Estate and
on behalf of his next-of-kin
and beneficiaries, individually,

     Plaintiff-Respondent,

v.

NEW JERSEY TRANSIT
CORPORATION and
NEW JERSEY TRANSIT
RAIL OPERATIONS, INC.,

     Defendants-Appellants.

_____

Submitted January 28, 2025 – Decided June 9, 2025

Before Judges Gilson, Firko, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law
Division, Atlantic County, Docket No. L-0723-19.

Matthew J. Platkin, Attorney General, attorney for appellants (Richard K. Hohn and John A. Thiry, on the briefs).

Ruben Honik (Honik LLC) and David J. Stanoch (Honik LLC), attorneys for respondent (David J. Stanoch, of counsel and on the brief; Ruben Honik, on the brief).

PER CURIAM

This appeal arises from a tragic accident in which a train operated by defendants New Jersey Transit Corporation and New Jersey Transit Rail Operations, Inc. (collectively, NJ Transit) struck the decedent Santos Alverio, Jr.'s[1] car at a railroad crossing. Following a trial, a jury found NJ Transit negligently maintained and operated the crossing gate arms, which caused Santos's death. The jury awarded plaintiff Melanie Alverio, representing her father's estate, $50,000 for pain and suffering on the survivorship action and $1,504,701 on the wrongful death action.

NJ Transit appeals from the October 6, 2023 order denying their motion for a new trial. They contend the trial court erred in denying their motion on the grounds of an inconsistent verdict. NJ Transit further contends the court

---

[1] Santos and his brother, George Alverio, later identified in this opinion, share a common surname. For clarity we refer to these parties by their first names. No disrespect is intended.

incorrectly charged the jury on the standard of liability for the dangerous condition of public property under the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3.  Having reviewed the record and the applicable governing principles, we reject NJ Transit's contentions and affirm the trial court's denial of the motion for a new trial.

I.

On April 9, 2019, plaintiff filed a complaint under the New Jersey Survivor's Act, N.J.S.A. 2A:15-3, and the Wrongful Death Act, N.J.S.A. 2A:31-1 to -6, alleging the Line Street crossing in Hammonton constituted a dangerous condition of public property under the TCA.  The complaint alleged that NJ Transit negligently operated the train, failed to properly maintain operational crossing warning and control devices, and that the crossing warning and control devices either malfunctioned or failed to activate.

A jury trial took place in August 2023.  We recite the relevant facts from the testimony and evidence presented at trial.

On March 9, 2018, at 1:15 a.m., NJ Transit's trouble desk received a report from the NJ Transit Police that the "[g]ate [was] stuck down at [the] Line Street [crossing] in Hammonton."  The gate was stuck in the lowered position and was not properly functioning.  NJ Transit lead signal maintainer, Christopher Coston,

3

responded to the scene, conducted tests, and confirmed the gate arms functioned properly in the raised position. At trial, Coston stated the gate arm is required to descend ten to twelve seconds from activation to a fully horizontal position. He described it as an activation failure if it was reported that "one gate recovered [while] the other [did not]." However, if it was a "call out" because the gates were reported down—"one gate [was] up and one [was] down," Coston considered that a "false activation." When questioned about his deposition testimony that an activation failure occurs when a gate is "stuck" in the up, down, or middle position, Coston stated that he "misspoke" because an activation failure was not defined as "the movement of a gate which [is not] in conformity with the signal that [it is] designed to produce."

On direct examination, Coston had no independent recollection of tests performed at the Line Street crossing. After reviewing his call records, Coston acknowledged that he had not opened the mechanical box on the gate arm to inspect the components responsible for initiating and powering the gate's downward motion. These records showed that Coston only performed Test 26A and listed the gate malfunction as a "[c]rossing [f]ail[ure]."[2]

---

[2] Both Federal Railroad Administration (FRA) Rules and NJ Transit's Standard Operating Procedures (SOPs) mandate which the tests must be performed when

Later that day at 4:30 p.m., Santos drove eastbound on Line Street through the crossing with his brother George sitting in the front passenger seat. He was not speeding or driving in the wrong traffic lane. Approximately one second after Santos crossed the stop line and proceeded onto the tracks, his car collided with an oncoming NJ Transit train traveling southbound on the Atlantic City Line at the Line Street crossing. The impact caused Santos's car to spin around and veer off the railroad tracks. Santos suffered fatal injuries and was pronounced dead at the scene. George suffered serious injuries, was airlifted to a hospital for treatment, and ultimately survived.

Joseph Skaggs, an NJ Transit signal maintainer, testified that he followed NJ Transit SOP S-23 when he inspected the crossing after the accident. He stated that he made the "necessary observations and tests" to determine whether the gate was properly working. However, on direct examination, Skaggs acknowledged he recorded that he performed only Test 26A, which showed no

there is a reported gate malfunction at a railroad crossing. NJ Transit SOP "S-23 – Special Instruction Governing Construction and Maintenance of Signals and Interlockings" (SOP S-23) adopts the FRA Rule 505 "Test 26A," "Test 26B," and "Test 26C," which governs the maintenance activities of the transit agency.

indication of delayed or inadequate signaling at the crossing; so, he did not conduct a "complete" Test 26C.

The contested issue at trial was the position of the gate arm at the time of the accident and whether the operational tests that were, or should have been, performed by NJ Transit personnel were ministerial or discretionary functions. Both parties conceded that the gate arm on the far side of the crossing was properly lowered. However, the parties provided conflicting accounts regarding the position of the gate arm as Santos approached and entered the crossing.

George, as the sole eyewitness, testified he did not hear a train horn when the car crossed onto the tracks. Additionally, he stated the signal lights were not functioning, and the gate arms were not lowered when the car entered the crossing. Nor did Santos drive around an already lowered gate, which was supported by plaintiff's expert witnesses James Sobek and George Gavalla. George's last word to Santos was the warning "train!"

Plaintiff's forensic engineering and accident reconstruction expert, Sobek, testified that he reviewed video footage from the front of the locomotive (train cab) obtained from NJ Transit, which was enhanced for better resolution to extract "fine detailed data." Sobek then provided testimony about his frame-by-frame analysis of the accident, while narrating the video. The video showed ice

A-0849-23

and snow on the ground. It also depicted a gate lowered down on the "[north] [and] on the south side" at the intersection before Line Street.

Sobek disputed NJ Transit's theory that the accident occurred because Santos's car went around the lowered gate. According to Sobek, Santos went past the gate arm raised at a " ten-degree [angle]" and the "entire mast and lamp assembly." Sobek opined that Santos's car did not make contact with the gate arm given the absence of any material transfer or scratches from either the car or the gate arm. The train collided with Santos's car, which was perpendicular to traffic. At no time was Santos's car in the opposing lane. Following the collision the train stopped.

Based on his review of the video, Sobek concluded that the southern gate had not fully lowered. He opined "the gate [arm] was up when the train was . . . four or five seconds away—and it never did get down until the car was on the crossing." He opined the "[crossing] gate did not assume the required horizontal position at least five seconds before the train arrived [at] the crossing, which constituted a violation of federal regulation 49 [C.F.R.] § 234.223 Gate Arm." The regulation provides:

> Each gate arm, when in the downward position, shall extend across each lane of approaching highway traffic and shall be maintained in a condition sufficient to be clearly viewed by approaching highway users. Each

A-0849-23

gate arm shall start its downward motion not less than three seconds after flashing lights begin to operate and shall assume the horizontal position at least five seconds before the arrival of any normal train movement through the crossing. At those crossings equipped with four quadrant gates, the timing requirements of this section apply to entrance gates only.

George Gavalla, plaintiff's railroad safety expert, testified that the gate was not fully lowered until after Santos's car passed through the gate. Gavalla explained that FRA rules and NJ Transit's SOPs mandated that Tests 26A, B and C be performed after the "stuck" gate arm was initially reported and after the collision. Based on his review of the NJ Transit post-investigation activities, he did not see any record that the mandatory tests were performed by NJ Transit personnel. Gavalla opined that NJ Transit's failure to perform all of the required post-accident tests was a deviation from the federal standard of care for railroad operations.

Gavalla further opined the failure of the gate to lower until after Santos was in the vicinity of the railroad crossing was a failure of its mandatory safety critical standard of care. He explained the "[southwest] crossing gate [arm] failed to operate in accordance with mandatory safety critical standards of care" in 49 CF.R. 234.223 and the Manual of Uniform Traffic Control Devices

8

(MUTCD) § 8C.04[3] because the "gate failed to descend to the horizontal position five seconds before the arrival of the train at the crossing." He opined that, based on critical mandatory standards and New Jersey SOPs, the crossing gate arm should have taken approximately sixteen to eighteen seconds to lower to a horizontal position.

Gavella also testified that for the gate arms to function properly, the train's shunting must transmit a signal to the mechanical box, causing the gate arm to lower if the sequence is correct. He explained the download of the recording device does not record the position of the gate or reveal the operation of the mechanism. He further explained the investigation records revealed that NJ Transit personnel did not check the hold clear device, which is located inside the mechanical box and holds the gate arm up in a full vertical position, at 1:15 a.m. or post-accident.

---

[3] The manual was developed by the Federal Highway Administration. MUTCD § 8C.04 states: "Traffic control for grade crossings includes all signs, signals, markings, other warning devices, and their supports along highways approaching and at grade crossings. The function of this traffic control is to promote safety and provide effective operation of rail and/or LRT and highway traffic at grade crossings." See U.S. Dep't of Transp. Fed. Highway Admin., Manual on Uniform Traffic Control Devices for Streets and Highways (2023), https://mutcd.fhwa.dot.gov/.

A-0849-23

Based on years of experience maintaining crossing signals, Gavella explained that when a gate makes contact with a car, it will leave a mark on the fiberglass gate. Moreover, based on the testimony of an NJ Transit supervisor indicating there was evidence the gate arm made contact with Santos's car, Gavalla opined that there were no contact because the gate arm showed no visible marks.

Lastly, Gavalla addressed the proper train horn warnings under the federal regulations. After analyzing the train horn sounds and patterns from the data recorder, he concluded the train horn sounded three times within five seconds before the train approached the prior crossing, remained silent for six and a half seconds, and then resumed sounding the train horn one or two seconds before the train approached the Line Street crossing where the collision occurred. According to Gavalla, the train horn warning sound did not comply with the FRA rules.

James Janelli, signal supervisor for the Atlantic City line stretching from Pennsauken to Atlantic City, testified on behalf of defendant. Janelli stated that when he arrived at the scene, the retired supervisor and Skaggs were already present. He observed NJ Transit personnel conducting operational tests on the

gate mechanical box and noted both gates raised and lowered without any delays in either direction.

Janelli's role in the post-accident investigation was limited to the download of the event recorder. Simply put, his function was to confirm from the electronic download that the electric component of the highway crossing monitor worked. He explained that he performed a "full" Test 26A, which showed the crossing was activated thirty-four seconds prior to arriving at the street and showed the "proper sequence and proper timing that represented a train move." The download also indicated "normal train move[ment]s" for the prior trains, showing that they operated in the proper sequence and with the proper timing.

After reviewing the downloaded records admitted at trial without objection, Janelli testified that the gate had reportedly been lowered for approximately five or six minutes when the issue was reported at 1:15 a.m.; however, the gate was clear by the time Coston arrived. The data further showed no evidence of any delay in the activation of the crossing arm or the signal system. Nevertheless, he described Coston's call-out as a "crossing failure."

Janelli further testified that the SOP mandates gate arms to be fully deployed for twenty-one seconds before a train arrives at a crossing. Moreover,

11

the SOP imposes a more stringent standard than the requirements set forth in the FRA rules.

Coston, Skaggs, and Janelli acknowledged that signal maintainers were obliged to follow S-23 to ensure the safe and proper operation and maintenance of a railroad crossing. Coston testified that because there was no activation failure, Tests 26B and 26C were not required to be conducted. Skaggs testified at trial that conducting Tests 26A, 26B, and 26C following a fatal accident was mandatory; however, he regarded them as ministerial. On cross-examination, however, Janelli wavered in his testimony, stating that "shall" as outlined in Rule 503, was "more suggestive," akin to "may."[4] Post-accident records

---

[4] The rule reads:

> When there is an accident at a crossing protected by automatic highway crossing warning devices, manual protection must be provided as soon as possible. . . . As a minimum, a monthly Test 26A test shall be performed. In addition, shunt test each track circuit and observe that the crossing warning devices function as intended. Download even recorder (if equipped) and make backup copy while at location. If the accident involves serious injury, fatality or reports that the warning devices malfunctioned, more extensive tests shall be performed. These may include Test 26B and C, as well as Test 2 Insulation Resistance, Test 4 Relays and Test 24 Track Circuits. . . .
>
> [SOP-23].

confirmed several mandatory tests required to verify the gate was functioning properly at the time of the accident were not conducted.

On direct-examination, NJ Transit's expert accident reconstructionist, Richard Moakes, testified the mechanical devices—flashing lights on the arm and the stop lights on the mast—were activated warning signals as Santos slowly approached and entered the crossing. He further stated that the train sounded its horn approximately 1,500 feet from the Line Street crossing. Moakes opined that the southern gate was fully deployed in the horizontal position, which "close[d] the lane of travel when [Santos] approached [from the] northbound direction on Line Street . . . at approximately 9:24 p.m.," which differed from the NJ Transit police report. He further opined Santos disregarded the signal lights and warning bells at the gate and ran into the gate.

On cross-examination, Moakes testified that the gate arm was fully lowered at approximately 4:29 p.m. based on the conclusions in the NJ Transit police report. However, Moakes had not analyzed or calculated the duration of time that he believed the gate was fully lowered. Instead, he relied on deposition testimony and post-accident investigation reports prepared by NJ Transit personnel, which concluded the gate arm was lowered in a timely manner and

A-0849-23

was functioning properly, findings he found satisfactory. Moakes conceded the gate was not lowered for a full twenty-one seconds before the train arrived.

Moakes further testified that video footage showed Santos drove under the crossing gate and made contact with it. However, upon inspecting Santos's car, he found no scratches or other material transfers that could definitively be attributed to contact with the gate. There was no evidence of damage to the gate on the evening of the collision. According to Moakes, based on his review of the video, the gate arm was lowered before the collision, "hit the windshield up towards the top of the windshield," "became airborne" then Santos slowed down as it passed underneath the southern gate arm and lowered behind the car's hatch. However, Moakes also did not review FRA rules regarding activation failure or Sobek's frame-by-frame analysis of the accident.

Following an off the record charge conference, NJ Transit agreed to plaintiff's proposed revisions to the jury instructions. Prior to the court's charge to the jury, NJ Transit stated on the record it did not object to either the jury instructions or the verdict sheet.

The jury returned a verdict, finding NJ Transit was negligent and, therefore, liable under the TCA because it had notice of the dangerous condition of the railroad crossing. The jury also determined the testing of the crossing

A-0849-23

gate arms and the warning of the train horn were ministerial functions. While the jury found Santos negligent in the operation of his car, it found his negligence was not the proximate cause of the accident. The jury then awarded plaintiff $50,000 for Santos's pain and suffering on the Survivor's Act claim and $1,540,701 for the loss of Santos on the Wrongful Death Act claim.

NJ Transit filed a motion for a new trial on two grounds. First, they argued the jury's finding that Santos was negligent but not the proximate cause of the accident was an inconsistent verdict. Second, NJ Transit argued the jury instruction and verdict sheet erred in permitting the jury to determine whether the acts of NJ Transit were discretionary or ministerial. Lastly, NJ Transit argued the jury should have been charged with the palpably unreasonable standard and not the ordinary negligence standard. Therefore, the "inconsistent" and "irreconcilable" verdict was "fatally defective" and should be set aside.

In an October 6, 2023 order accompanied by a written decision, the trial court denied NJ Transit's motion. The court noted NJ Transit did not object to the jury instructions prior to charge despite having "ample time" to make their objection known to the court. The court then analyzed Rule 4:49-1(b) and the governing law concerning negligence and the standard of liability under the TCA and found the "jury instructions were proper and consistent with the

holding" in <u>Henebema v. S. Jersey Transp. Auth.</u>, 219 N.J. 481 (2014). The court reasoned that conflicting testimony from a "number of witnesses" about the tests required by the FRA and NJ Transit's SOPs created a factual question for the jury.

The court further found there was "no inconsistence in the jury's finding that plaintiff was negligent, but his negligence was not a substantial factor in bringing about the accident." The court stated there was "an abundance of evidence presented at trial regarding the negligence of [NJ Transit] in the sounding of the train horn as well as the maintenance of the gate mechanism." This appeal follows.

## II.

On appeal, NJ Transit reprises the arguments made before the trial court. It argues the trial court erred in denying its motion based on the inconsistent verdict. NJ Transit also argues the trial court incorrectly charged the jury on the standard for liability for a dangerous condition. Additionally, it contends the TCA mandates the application of the "palpably unreasonable standard" regardless of whether the public entity's conduct is discretionary or ministerial. Having considered NJ Transit's contentions and the applicable law, we conclude both arguments are unavailing.

## III.

NJ Transit did not object to the jury instructions or verdict sheet at trial; thus, we review for plain error. See State v. Montalvo, 229 N.J. 300, 320 (2017); R. 2:10-2. Plain error requires a determination of "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)). In civil cases, plain error relief "should be sparingly employed." Baker v. Nat'l State Bank, 161 N.J. 220, 226 (1999) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)) (internal quotation marks omitted).

### A. The Verdict Sheet.

We hold the trial court did not err in denying NJ Transit's motion for a new trial on the basis of an inconsistent verdict finding Santos negligent but not the proximate cause of the accident. We are not persuaded by NJ Transit's contention that the verdict was "inconsistent and irreconcilable."

NJ Transit is entitled to a new trial only if it establishes that "there was a miscarriage of justice under the law." Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011)) (internal quotation marks omitted). A miscarriage of justice occurs when "there is a 'manifest lack of inherently credible evidence to support the

17

finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Ibid. (quoting Risko, 206 N.J. at 521-22). This same standard governs our review on appeal. Risko, 206 N.J. at 522.

A jury verdict is entitled to a presumption of correctness. Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977); see also Conforti v. Cnty. of Ocean, 255 N.J. 142, 162-63 (2023) (holding a verdict will be upheld if any evidence and legitimate inference therefrom support the verdict). In that regard, "[a] jury verdict is entitled to considerable deference . . . ." Risko, 206 N.J. at 521. "On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski ex rel. Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005). "[A] trial court should not interfere with a jury verdict unless the verdict is clearly against the weight of the evidence." Caldwell v. Haynes, 136 N.J. 422, 432 (1994). To overturn a jury verdict, "[t]he verdict must shock the judicial conscience." Ibid.

Proximate cause is an essential element of a negligence claim. Ptaszynski v. Atl. Health Sys., Inc., 440 N.J. Super. 24, 38 (App. Div. 2015). "Proximate cause consists of 'any cause which in the natural and continuous sequence,

unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'" Gilbert v. Stewart, 247 N.J. 421, 443 (2021) (quoting Townsend v. Pierre, 221 N.J. 36, 51 (2015)) (internal quotation marks omitted). If concurrent causes were capable of producing the harm or injury, the substantial factor test is applied. Id. at 444.

Applying this deferential standard of review, we find that the jury's liability verdict neither shocks the judicial conscience nor amounts to a miscarriage of justice. In denying the motion for a new trial, the trial court cited Janelli's testimony that the railroad gate should have been lowered for twenty-one seconds before the train crossed at Line Street. The court appropriately found "the jury could accept [Santos] was negligent for disregarding the other warnings, but his negligence was not the proximate cause of the accident." The court's stated:

> The purpose of the gate closing was to prevent [Santos] from entering the crossing. The gates malfunction was the substantial factor in bringing about the accident, not [Santos's] failure to heed the other warnings. . . . The failure of the gate being in the down position could give an oncoming motorist the false sense the train is further away, and it is safe to cross. Thus, the court finds there was no inconsistence in the jury's finding that [Santos] was negligent, but his negligence was not a substantial factor in bringing about the accident.

19

Having reviewed the record, we conclude that the trial judge's findings and reasoning are amply supported by the record. The trial court analyzed and properly applied the substantial factor test. See Verdicchio v. Ricca, 179 N.J. 1, 25 (2004). We, therefore, affirm the trial court's order denying NJ Transit's motion for a new trial on whether Santo's negligence was the proximate cause of his death.

B.    The Jury Instructions.

We next address NJ Transit's contention that the palpably unreasonable standard should have been applied regardless of whether the acts of NJ Transit employees were discretionary or ministerial. They contend the trial court was "misguided" because liability under N.J.S.A. 59:4-2 is predicated on palpably unreasonable conduct and not ordinary negligence. Based on the record and the appliable law, NJ Transit's contention lacks merit.

The record shows that during the initial charge conference, the court reviewed the proposed verdict sheet and jury instructions, and neither counsel raised any objections. The charge conference resumed the following day; however, the court did not conduct an on-the-record charge conference as required pursuant to Rule 1:8-7. Instead, the court conducted an all-day off-the-record charge conference and the parties finalized the jury instructions and

20

verdict sheet. Subsequently, the plaintiff submitted proposed revisions to the draft jury instructions and verdict sheet to the court; NJ Transit did not.

The trial court revised the jury instructions and verdict sheet, with no objection from NJ Transit. In instructing the jury, the trial court charged the jury with model jury charge for ordinary negligence. See Model Jury Charge (Civil), 5.10A, "Negligence and Ordinary Care—General" (rev. Oct. 10, 2022). Aligned with NJ Transit's affirmative defense that its challenged conduct was discretionary and not ministerial, NJ Transit requested a special form instruction on railroad crossings that incorporated the ordinary negligence standard. Accordingly, the trial court charged Model Jury Charge (Civil), 5.21, "Duty of Railroad at Public Highway Grade Crossing" (approved before 1983).

The TCA "indisputably governs causes of action in tort against governmental agencies within New Jersey." Gomes v. Cnty. of Monmouth, 444 N.J. Super. 479, 487 (App. Div. 2016); see also N.J.S.A. 59:2-1(a); Nieves v. Off. of the Pub. Def., 241 N.J. 567, 571 (2020). Under the TCA, immunity is the general Rule "and liability is the exception." Henebema, 219 N.J. 481, 490 (2014).

"The standard for liability under the TCA depends on whether the conduct of individuals acting on behalf of the public entity was ministerial or

discretionary." Est. of Gonzalez v. City of Jersey City, 247 N.J. 551, 571 (2021) (quoting Henebema, 219 N.J. at 490). "When a public entity's or employee's actions are discretionary, liability is imposed only for 'palpably unreasonable conduct.'" Ibid. (quoting Henebema, 219 N.J. at 495). Liability for ministerial acts "is evaluated based on an ordinary negligence standard." Ibid. (quoting Henebema, 219 N.J. at 490).

"A 'discretionary act . . . calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.'" S.P. v. Newark Police Dep't, 428 N.J. Super. 210, 230 (App. Div. 2012) (omission in original) (quoting Kolitch v. Lindedahl, 100 N.J. 485, 495 (1985)).

In contrast, "a ministerial act, which is not granted immunity under the TCA, is an action 'which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done.'" Gonzalez, 247 N.J. at 571-72 (quoting S.P., 428 N.J. Super. at 231). NJ Transit, as the party seeking immunity under the TCA, "must 'come forward with proof of a nature and character [that] would exclude any genuine dispute of fact . . . .'" Kolitch, 100 N.J. at 497 (quoting Ellison v. Hous. Auth. of S. Amboy,

162 N.J. Super. 347, 351 (App. Div. 1978)). "[W]hen the parties dispute the predicate facts necessary for deciding whether the conduct of a public entity was discretionary or ministerial conduct[,] . . . that dispute requires submission to the jury." T.B. v. Novia, 472 N.J. Super. 80, 97 (App. Div. 2022) (quoting Henebema, 430 N.J. Super. at 506).

Based on the record, we are convinced the trial court appropriately determined the issue of NJ Transit's liability and whether the railroad crossing was a dangerous condition was a "question for the finder of fact." See Vincitore ex rel. Vincitore v. N.J. Sports & Exposition Auth., 169 N.J. 119, 123 (2001). Additionally, NJ Transit asserted an affirmative defense, claiming that the actions of its employees were discretionary. The record depicts conflicting testimony from NJ Transit's personnel and both parties' experts whether the FRA rules incorporated into the SOPs were discretionary or ministerial. Pursuant to Henebema, the jury instruction prepared by the court, without objection from NJ Transit, included language from Model Jury Charge (Civil), 5.20A, "Dangerous Condition of Public Property" (rev. Jan. 2019), regarding the distinction between discretionary and ministerial acts based on a genuine dispute of material facts. Id. at 6.

A-0849-23

We also note NJ Transit requested that the jury be charged on its duty at a public railroad crossing, which is the ordinary negligence standard. See Model Jury Charge (Civil), 5.21. Thus, we conclude NJ Transit has not demonstrated any prejudice by the jury instructions and discern no reservable error by the trial court. See Mogull v. CB Com. Est. Grp., Inc., 162 N.J. 449, 446 (2000) (holding jury instructions given in accordance or that closely track model jury charge are not erroneous).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0849-23