**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4690-18

JANET YIJUAN FOU,

 Plaintiff-Respondent,

v.

KEVIN KERVENG TUNG, PC,
and KEVIN TUNG, ESQ.,

 Defendants-Appellants.

_____

Submitted February 3, 2021 – Decided August 25, 2021

Before Judges Ostrer, Accurso, and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-6259-12.

Lewis Brisbois Bisgaard & Smith, LLP, attorneys for appellant Kevin Kerveng Tung, PC (James M. Strauss, on the brief).

Kevin Tung, Esq., appellant pro se.

Pashman Stein Walder Hayden, PC, attorneys for respondent (James A. Plaisted and Michael J. Zoller, on the brief).

PER CURIAM

Following a jury trial and verdict in this legal malpractice case, the court entered a January 11, 2019 final judgment against defendants Kevin Kerveng Tung, P.C. (Tung, P.C.) and Kevin Tung, Esq. (Tung) imposing joint and several liability for $1,547,063.31 in damages ($500,000), attorney's fees ($702,000), prejudgment interest on the jury's damages award ($65,250), and prejudgment interest on the award for attorney's fees and costs ($279,813.31). Defendants appeal from the final judgment; a June 25, 2018 order denying their motion for judgment notwithstanding the verdict or a new trial; a May 22, 2019 order denying their motion for reconsideration of the court's January 28, 2019 order striking paragraph four of a December 27, 2018 order relating to purported double recovery; and various evidentiary rulings made by the trial court. Based on our review of the record and the arguments of counsel in light of the applicable legal principles, we affirm in part, vacate in part, and remand for further proceedings.

I.

The legal malpractice claim against defendants arises out of Tung, P.C.'s and Tung's representation of plaintiff Janet Yijuan Fou in a matrimonial case

A-4690-18

against plaintiff's former husband, Joe Fou (Fou).[1]  Based on the malpractice trial record, we first summarize the facts pertinent to the matrimonial matter and then detail the facts concerning the malpractice case.

Tung's Representation of Plaintiff in the Matrimonial Action

Married in 1975, plaintiff and Fou discussed dissolving their marriage in 2007.  On September 22, 2007, they signed an agreement written in Chinese expressing their intention to divorce and providing that plaintiff would receive approximately $400,000, representing one-half of the marital assets, and $10,000 annually in support payments.[2]

Shortly thereafter, plaintiff discovered what she described as a draft will on Fou's computer showing the family had personal and business assets totaling more than $2,200,000.  Around the same time, plaintiff found encrypted computer records that she later learned in 2013 described family business assets valued at $2,200,000.  In November 2007, plaintiff and Fou signed another agreement written in Chinese stating plaintiff had received $400,000 and other

_____

[1]  Tung was employed by Tung, P.C. during his representation of plaintiff in the matrimonial action.  The record shows that subsequent to the entry of the final judgment in this matter, Tung, P.C. filed for bankruptcy and has advised it is currently a debtor in possession.

[2]  English translations of plaintiff's and Fou's putative agreements, which were written in Chinese, were admitted in evidence at trial.

A-4690-18

property, and providing that the assets of the family business would be "counted separately."

In 2009, Fou contacted Tung at Tung, P.C., and arranged a meeting to discuss the filing of an action for an uncontested divorce. On February 15, 2009, plaintiff and Fou met with Tung. They brought a tax return reflecting Fou's income, and a typewritten page that included biographical information. During the meeting, Tung did not inquire about Fou's business or Fou's and plaintiff's assets. It was decided Tung would represent plaintiff in the divorce matter; Fou would be the named defendant in the case; and Fou would appear as a self-represented litigant in the matter.

Plaintiff and Fou brought two new agreements written in Chinese to the February 15, 2009 meeting with Tung. One of the agreements, labeled "Divorce Agreement," provided that Fou would pay plaintiff one-third of his salary as alimony in four installments each year, and plaintiff and Fou would share the tuition expenses of their younger son and maintain the marital home until their older son married. The Divorce Agreement further stated plaintiff and Fou had completed the division of family assets but agreed the "real property and company assets [were] to be accounted for separately." According to plaintiff, she and Fou signed three copies of the Divorce Agreement in Tung's presence,

4

Tung notarized their signatures, and she, Fou, and Tung each retained a copy of the agreement. Plaintiff testified Tung retained a copy of the agreement because he was to translate it into English and incorporate its terms into the divorce property settlement agreement.

During the February 15, 2009 meeting, plaintiff and Fou also signed a second agreement, labeled "Supplemental Divorce Agreement," but they did not show the agreement to Tung or give him a copy. The agreement, which was written in Chinese, provided that upon the "close of business" of the family's company, "G&E," plaintiff would receive one-half of the business's assets. The agreement also provided that plaintiff would assist in the ongoing operation of the business, and Fou would pay $20,000 into plaintiff's and Fou's medical expense fund.

Less than two weeks later, on February 27, 2009, plaintiff and Fou again met with Tung. At the meeting, Fou presented Tung with a putative retainer agreement for Tung's representation of plaintiff in the divorce proceeding. Tung later testified he was unaware of New Jersey Court Rule 5:3-5 that required he have a retainer agreement with plaintiff as his client in the divorce case. The agreement Fou presented states Tung "acts as the attorney" for plaintiff, but the agreement did not define or limit the scope of his representation of her. Tung

5

testified he was retained solely to act as a scrivener of the terms for the uncontested divorce, preparing the documents necessary to reflect the agreement plaintiff and Fou had reached on their own. Plaintiff testified at the malpractice trial that Tung never advised her of any limitations on his representation of her in the matrimonial action.

During the meeting, Tung presented plaintiff and Fou with various documents, written in English, that he and another employee at Tung, P.C. prepared, including a proposed summons and complaint for divorce, a case information statement (CIS), and a property settlement agreement (PSA). Tung reviewed the documents in plaintiff's and Fou's presence. The CIS listed gross family assets of $234,688 and a prior year's joint income of $77,536.

Plaintiff and Fou signed the PSA, which stated they made a full disclosure of all assets and income to each other. The PSA further stated that, beginning in January 2009, Fou would pay one-third of his annual salary as alimony to plaintiff; each party was responsible for his or her own debts; plaintiff and Fou would maintain the marital home until their older son married; and plaintiff and Fou would retain all other assets in their possession with "no further equitable distribution." The PSA was consistent with the Divorce Agreement plaintiff and Fou signed on February 15, 2009, and gave to Tung, except the PSA did not

6

make a provision separately addressing plaintiff's and Fou's real property and company assets, and the PSA precluded further equitable distribution of their assets.

Although Tung and Tung, P.C. represented plaintiff in the divorce, during the two meetings at Tung's office, the conversations were primarily between Tung and Fou. Tung testified that during the meetings, plaintiff "didn't talk; she'd just sit there," and he "always" spoke with Fou. Following the first meeting, Tung and his office communicated with Fou when additional information was needed or Fou had questions. During his deposition testimony, which was read into the record at the trial in the malpractice case, Tung explained: "Pretty much we dealt with . . . Fou for th[e] divorce case. All the information we receive is from . . . Fou. Not from [plaintiff]. We didn't talk to her."

Following the February 27, 2009 meeting, Tung spoke with plaintiff only during two brief phone calls—one of which was for the purpose of confirming she was "still alive," and the other to inform her of the court hearing date. At the subsequent court proceeding, Tung first met briefly with plaintiff and informed her to answer affirmatively the questions he and the court posed. Fou did not appear at the court proceeding on the divorce.

7

A-4690-18

During the proceeding, plaintiff testified through an interpreter and Tung presented plaintiff with the PSA he drafted in English. As noted, the PSA did not make a provision for the separate allocation of plaintiff's and Fou's real property and company assets as set forth in the February 15, 2009 Divorce Agreement, and the PSA barred plaintiff from seeking any further equitable distribution of property. The court incorporated the PSA into the final judgment of divorce, which was entered on May 4, 2009.

In 2009, while living in New Jersey, plaintiff applied for Medicaid benefits using a New York address and stating she was a New York resident. Plaintiff did not move to New York until July 2010. Her Medicaid application stated she received only $600 per month in alimony, and that she had only $3,000 in assets.[3] Her annual Medicaid reapplication forms listed comparable amounts. The amounts were inconsistent with those set forth in the PSA.

Plaintiff's Medicaid benefits terminated in late 2011, when she turned sixty-five and qualified for Medicare. The following year, plaintiff received a letter from the New York City Human Resources Administration demanding

---

[3] Plaintiff testified during the malpractice trial that her net alimony income, after paying her son's tuition, was $600 per month, and the value of the total assets in her name was $3,000, at the time she completed the Medicaid application.

repayment of her Medicaid benefits because she had applied for Medicaid in New York before moving there. Plaintiff settled the claim in May 2015; she agreed to repay $10,500, and she acknowledged the Medicaid benefits were "incorrectly received." Plaintiff's settlement agreement states plaintiff's payment "is not to be construed as an admission of wrongdoing." Following the filing of plaintiff's malpractice case against him, Tung alerted authorities of potential fraud in plaintiff's application for Medicaid benefits.

Plaintiff Retains New Counsel

In April 2011, plaintiff sought a division of the business assets from Fou pursuant to the Divorce Agreement. Fou refused. Plaintiff first contacted Tung, but later retained her current counsel to reopen the matrimonial action and set aside the PSA. At the same time, plaintiff retained her current counsel on a contingent fee basis to pursue a malpractice action against Tung and Tung, P.C. The contingent fee agreement initially provided counsel would receive thirty-three-and-a-third percent of any recovery, and later was amended to provide counsel would receive fifty percent of the first $500,000 recovered and thirty-three-and-a-third percent of anything over $500,000, with counsel paying all disbursements.

A-4690-18

Plaintiff's Motion to Vacate the Judgment of Divorce and PSA

In September 2011, plaintiff's counsel filed a motion to set aside the judgment of divorce and the PSA, and to obtain discovery of Fou's income and assets. Fou opposed the motion.

In support of the motion, plaintiff submitted a certification describing the contents of the four agreements between her and Fou that had been written in Chinese (the Chinese agreements) and Tung's reliance on Fou for the information used to draft the PSA and documents for the matrimonial matter. Plaintiff certified that because of her limited ability to understand English, she did not realize the PSA omitted the terms of the agreements written in Chinese between her and Fou regarding the business assets. She asserted Tung did not ask her about other agreements during his representation or "mention the 'Chinese [a]greements' previously executed" to the court at the divorce hearing on May 4, 2009. She further certified Fou concealed assets in China.

On December 2, 2011, the Family Part ordered a plenary hearing on the enforceability of the PSA. In 2012, the court conducted a four-day hearing during which Tung testified as a witness for Fou, advocating in favor of the validity of the PSA, and acknowledging he prepared the PSA in accordance with Fou's instructions. Fou acknowledged making wire transfers to China in

connection with his business in an amount of close to $1,000,000. He disputed the $2,200,000 figure in his draft will but acknowledged sending the encrypted financial information to his son, which included figures supporting an asset valuation of $2,200,000.

In September 2012, the court rendered an oral opinion and entered an order finding the PSA to be null and void. The court found invalid the retainer agreement between plaintiff and Tung, and determined Tung did not provide independent counsel to plaintiff. The court also found plaintiff was "manipulated through th[e] divorce process" because Fou was the "conduit of all information" with Tung. The court further held the PSA was inconsistent with the Chinese agreements between plaintiff and Fou, and that all the agreements were invalid. The court's order barred plaintiff and Fou from transferring, selling, or encumbering any marital assets, and directed that a plenary hearing be held to address equitable distribution and alimony.

Fou did not cooperate or provide discovery in the reopened matrimonial litigation. The court suppressed his pleadings with prejudice and entered a default against him. The court later ordered Fou to pay $7,929 in counsel fees in connection with his failure to provide discovery. The court directed that

11

plaintiff submit a notice of equitable distribution under Rule 5:5-10. Plaintiff complied with the court's order.

In February 2014, a different judge held a plenary hearing to determine equitable distribution and alimony. The court found the evidence, including plaintiff's testimony as to the couple's assets and Fou's draft will, and "many thousands of other pages," demonstrated assets totaling $2,200,000. Fou did not appear for the hearing and therefore did not dispute the value of the marital assets.

The court entered an Amended Final Judgment of Divorce (AFJD) awarding plaintiff: permanent annual alimony in the amount of the greater of $18,000 or one-third of Fou's income; $1,100,000, representing one half of the total value of the family business as of November 2007; and a share of any subsequent increase in the business's value. The court further permitted plaintiff's filing of a lis pendens on property Fou purchased in North Carolina. The court also awarded plaintiff $229,389.69 in counsel fees.

Fou appealed from the AFJD. We affirmed the order and the court's counsel fee award. See Fou v. Fou, No. A-1569-14 (App. Div. July 21, 2016)

A-4690-18

(slip op. at 24-25). The Supreme Court denied Fou's petition for certification. See Fou v. Fou, 238 N.J. 370 (2019).[4]

Following entry of the AFJD, plaintiff was unable to collect on the judgment, aside from her attachment of Fou's social security benefits. In November 2017, the court issued an arrest warrant for Fou for unpaid alimony and equitable distribution, but it appears Fou resides in China. The court's order states Fou had "not complied with any of the [AFJD's] equitable distribution" requirements.

The Malpractice Action Against Tung and Tung, P.C.

In her malpractice action, plaintiff alleged defendants were negligent in their representation of her in the initial uncontested divorce case. Plaintiff alleged defendants were negligent by failing to: conduct discovery of her and Fou's assets; include key terms from the Chinese agreements in the PSA; and address in the PSA "issues that necessarily arise in a [d]ivorce proceeding," including the division of the family's business assets. Plaintiff alleged defendants' negligence deprived her of her share of the marital business assets,

---

[4] In the fall of 2018, Tung filed a motion to intervene in the underlying matrimonial action, and the Family Part denied the motion. On June 12, 2020, we issued an opinion affirming the denial of the motion to intervene in Fou v. Fou, No. A-2145-18 (App. Div. June 12, 2020) (slip op. at 9). We also denied plaintiff's motion for fees and costs incurred in responding to Tung's motion.

real property, and other assets, and caused her to incur expenses and legal fees to vacate the PSA and obtain the AFJD. Defendants filed an answer denying the allegations. The court stayed the malpractice action pending the disposition of Fou's appeal from the AFJD in the matrimonial case.

On May 13, 2014, plaintiff made a $400,000 offer of judgment in the malpractice action. Tung denied his malpractice carrier authorization to accept entry of judgment in response to plaintiff's offer.

The Malpractice Trial

During the 2018 malpractice trial, plaintiff called Tung as a witness. He testified he did not provide plaintiff with a statement of client rights and responsibilities or a retainer agreement. He acknowledged Fou drafted his putative agreement with plaintiff. Further, he testified he was retained only to "prepare the paperwork to obtain a divorce judgment."

Tung explained he corresponded with Fou rather than plaintiff because Fou spoke better English. According to Tung, it was decided he would represent plaintiff because Fou "was in a rush to go to China for business." Tung testified plaintiff did not tell him about any of the Chinese agreements, including the agreements from September 2007 and November 2007, or the February 15, 2009 Supplemental Divorce Agreement.

14

Tung testified plaintiff and Fou gave him the February 15, 2009 Divorce Agreement that he notarized at the end of their meeting that day. He explained that he did not read it, review it, or offer any opinion on its contents and instead "was asked to do a notary" and merely served as a "witness for the signature[s]." Tung acknowledged he nonetheless told plaintiff and Fou the agreement would not be binding, and that only the PSA would be binding. He testified he did not give plaintiff any advice concerning the agreement or determine if signing the agreement was in her best interests. He stated he did not keep a copy of the agreement because he did not have a copier in his New Jersey office. His records from the meeting, however, include copies of plaintiff's and Fou's driver's licenses.

An attorney who represented plaintiff in the Family Part in connection with the motion to vacate the PSA testified concerning plaintiff's certification in support of the motion. He explained the certification did not assert that the four Chinese agreements were given to Tung and that, instead, plaintiff certified Tung never asked plaintiff about the existence of any agreements between Fou and her. The attorney further testified that encrypted financial records were admitted into evidence at the plenary hearing in the Family Part, and the records, including Fou's draft will, reflected plaintiff and Fou had $2,200,000 in assets.

A-4690-18

Plaintiff testified on her own behalf. She explained Fou handled the finances during the marriage, and most of the family's bank accounts were in Fou's name. Plaintiff testified that prior to the meeting with Tung, she understood the family's business assets were worth $2,200,000.

Plaintiff also testified that, at their first meeting with Tung, Fou brought three copies of the Divorce Agreement, but he did not bring the two 2007 agreements. She did not ask Tung for his opinion about the Divorce Agreement or for legal advice before signing it. Plaintiff explained she and Fou each kept a copy of the signed agreement, and Tung kept one for himself so he could translate it to English. According to plaintiff, Tung said he needed a week to translate the document and prepare the divorce papers, and he told her she would be the plaintiff in the divorce action because she was unhappy in the marriage. Plaintiff testified Tung did not ask her about equitable distribution, child support, or insurance.

Plaintiff also described the February 27, 2009 meeting, explaining Tung and Fou spoke with each other and she did not participate in the discussion. The meeting lasted approximately thirty minutes, and she signed many documents which were to be sent to the court. On the day of the divorce proceeding,

16

plaintiff met with Tung briefly at the courthouse, but he did not go over the documents with her.

In 2011 or 2012, Fou stopped making support payments to plaintiff. Fou also refused to share the family business assets with her. In March 2011, plaintiff met with Tung to discuss obtaining her share of the business assets from Fou. She showed Tung the February 15, 2009 Divorce Agreement, and he told her it was poorly written and that it would cost her a lot of money to recover anything from Fou. Plaintiff then realized the PSA did not address the division of the business assets, and she obtained new counsel. Plaintiff testified she incurred legal fees totaling $449,798.59 to vacate the PSA and judgment of divorce and obtain the AFJD against Fou.

Plaintiff also testified she never received the promised $400,000 payment from Fou, but instead received access to a mutual fund account with approximately that amount, titled in Fou's name. The account was later supplemented by an additional $62,276.50 plaintiff netted from a $100,400 payment from Fou. Plaintiff purchased an apartment in New York with the funds from the account. Plaintiff explained the marital residence was sold but she did not receive the proceeds from the sale because she gave them to her older son.

Plaintiff called Edward J. O'Donnell, Esq., as an expert witness in matrimonial law. O'Donnell reviewed the fee agreement Fou prepared, the PSA, the divorce complaint, transcripts of the matrimonial proceedings, the AFJD, the malpractice complaint, and Tung's deposition transcript, as well as "some miscellaneous correspondence."

O'Donnell opined that Tung deviated from the standard of care for a matrimonial attorney, as established by both acceptable practice and the Rules of Professional Conduct, during Tung's representation of plaintiff. O'Donnell testified Tung deviated from the standard of care by: meeting with plaintiff in Fou's presence because privacy is required for candid communications between an attorney and client; failing to inquire of plaintiff, his client, about marital assets and income, and whether either plaintiff or Fou had a will; and failing to take any steps to verify the parties' assets and instead accepting the information provided by Fou, who was the adverse party. O'Donnell opined that the PSA's declaration there was full disclosure between the parties concerning marital assets and income was incorrect. He testified standard practice required that plaintiff execute a formal waiver if she intended to disclaim her rights to Fou's business interests.

A-4690-18

O'Donnell also testified the record showed no "real communications as between . . . Tung and [plaintiff]," and extensive communications between Tung and Fou, the "adverse party." O'Donnell testified that Tung did not advise plaintiff of her options, inform her of her right to obtain discovery of Fou's financial information, or make plaintiff "aware of what [her] rights are." O'Donnell also opined the Chinese agreements should have been incorporated into, or at least referenced in, the PSA, but that Tung could not have done so for the agreements that neither plaintiff nor Fou disclosed to him.

Further, O'Donnell testified Tung deviated from the standard of care barring an attorney from representing both sides in a matrimonial case. O'Donnell found it was clear Tung represented plaintiff, but O'Donnell explained it was unclear whether Tung also represented Fou because Tung may have formed an attorney-client relationship with plaintiff and Fou, and Tung conducted himself as though he represented Fou. O'Donnell also opined Tung deviated from the standard of care requiring candor with the tribunal because, during the uncontested divorce proceeding, he failed to ask plaintiff whether she read and understood the PSA.

Finally, O'Donnell testified Tung deviated from the standard of care requiring written retainer agreements because the document Fou provided to

19

Tung did not comport with Rule 5:3-5. O'Donnell also noted the agreement did not include any limitation on the scope of Tung's representation of plaintiff in the uncontested divorce proceeding as required if his representation was subject to the limitation that he serve only as scrivener as he contended.

O'Donnell explained plaintiff experienced adverse consequences as a result of Tung's deviations from the standards of care. O'Donnell opined plaintiff "lost time and she lost opportunity" in her negotiations with Fou, waived her equitable interest in marital assets, including the couple's business assets, and lost leverage in resolving financial issues with Fou during the divorce proceeding. According to O'Donnell, plaintiff's loss is equal to "whatever she would have gotten ultimately by way of the divorce." O'Donnell also explained that as a result of defendants' deviations from the standards of care, plaintiff incurred counsel fees and costs to set aside the first judgment of divorce and obtain the AFJD. O'Donnell was not sure if Fou transferred or dissipated any assets between February 2009 and September 2012, when the AFJD was entered.

Chunsheng Lu, an expert in the field of "Chinese law as it relates to American law," testified for plaintiff by video. Lu testified a New Jersey Superior Court matrimonial judgment would not be recognized or enforced in

20

China because there is no treaty between China and the United States providing for enforcement of judgments.

Following presentation of plaintiff's evidence, defendants moved for an involuntary dismissal, arguing plaintiff failed to present evidence establishing they deviated from the standard of care. Defendants further argued plaintiff failed to present evidence establishing causation because plaintiff did not demonstrate Fou depleted or transferred any assets following entry of the original judgment of divorce and prior to entry of the AFJD. Defendants also argued plaintiff would obtain a "double recovery" if the jury awarded damages because she also could recover for the same alleged losses from Fou under the AFJD.

The court denied the motion, finding O'Donnell's testimony established defendants' alleged deviations from the applicable standards of care, and that evidence showing Fou purchased a home in North Carolina demonstrated he had the opportunity to move assets following the initial judgment of divorce. The court declined to address defendants' double-recovery contention, explaining it would consider the claim if the jury awarded compensatory damages.

21

Tung testified that Chinese was his native language, and that he earned his undergraduate and graduate degrees in the United States. He explained he practiced law for twenty years and had handled "at least 500" matrimonial cases.

Tung acknowledged Fou asked him for assistance in an uncontested divorce case, and he then met with plaintiff and Fou on February 15, 2009. During the meeting, they spoke in Chinese.

Fou told Tung he and plaintiff received insurance through a government program, and they had no children under the age of twenty-one. According to Tung, he asked them about alimony, pensions, retirement benefits, and the division of property, but plaintiff and Fou told him that they had resolved those issues themselves. Tung claimed he told Fou and plaintiff that his representation was limited to serving as a scrivener in an uncontested divorce, and that he would not render any legal advice as to the fairness of the division of property. He also told them the parties waive their right to discovery in an uncontested divorce. Fou further explained that one of them would have to be designated as the plaintiff and that he would represent that person only. He explained that plaintiff appeared to understand. Tung testified plaintiff told him and his staff to communicate with Fou for any additional information.

22

He also explained that at the end of the meeting, plaintiff and Fou asked him to notarize a document and he did so, but he did not read it and was not given a copy of that document or any other agreements between plaintiff and Fou. He testified that had he been given a copy of plaintiff's and Fou's agreements, he would have included their terms in the PSA.

Tung also described the February 27, 2009 meeting with plaintiff and Fou during which they reviewed the matrimonial pleadings and the PSA. He testified he reviewed the PSA with plaintiff line by line, in her native language, and told her she was waiving her right to discovery of Fou's assets. He also testified plaintiff did not identify any assets missing from the CIS.

Robert Zaleski, Esq., testified as an expert for the defense in the field of matrimonial law and the standard of care applicable to Tung's representation of plaintiff. He identified the pleadings, documents, and transcripts he reviewed in preparing his report, and he testified Tung did not breach any duty to plaintiff and did not deviate from the standard of care required. Zaleski opined Tung did not represent Fou at any time, and that plaintiff and Fou merely wanted Tung to memorialize the terms of their own agreements and "didn't want any help negotiating those terms." According to Zaleski, Tung did not have a duty to provide an opinion as to the fairness of the PSA.

A-4690-18

Zaleski also testified Tung's actions were not the proximate cause of any damages. He explained the AFJD granted plaintiff the exact relief she sought in the matrimonial action, including a $1,100,000 judgment against Fou, and that, as a result, Tung's representation of plaintiff did not result in any losses for her. Zaleski testified plaintiff could pursue collection of the judgment against Fou, and Zaleski did not find Tung caused plaintiff to incur counsel fees to vacate the PSA and initial judgment of divorce. Zaleski acknowledged, however, plaintiff had unsuccessfully tried to collect on the AFJD, Fou was in arrears on his alimony obligations, and the court ordered Fou's arrest in November 2017 because he failed honor his financial obligations under the AFJD.

At the close the evidence, defendants moved for judgment again, and the court summarily denied the motion. The jury returned a $500,000 damages verdict in plaintiff's favor.

Defendants moved for judgment notwithstanding the verdict or, alternatively, for a new trial, arguing plaintiff failed to prove causation, and that "the verdict violated basic fairness and judicial estoppel." They alleged plaintiff did not prove Tung caused her harm, and did not prove the quantum of the marital estate as of the time of the divorce, or at the time of the Family Part's

September 12, 2012 order freezing the marital assets. They alleged misrepresentations in plaintiff's trial testimony concerning the agreements shown to Tung at the February 15, 2009 meeting, and they again argued plaintiff might obtain a double recovery because the jury verdict awarded damages for amounts plaintiff might collect from Fou under the AFJD. Defendants further argued the court erred by admitting evidence concerning Fou's 2007 draft will, claiming it constituted inadmissible hearsay as against defendants.

The trial judge issued a written decision on defendants' motion, finding the trial evidence supported the jury's verdict, and noting plaintiff's damages included "those legal fees required to invalidate the" PSA and pursue the malpractice claim.

The court rejected defendants' claim plaintiff provided false testimony at trial about showing Tung the agreements. The court also found that, contrary to defendants' claim, plaintiff's certification supporting the motion to vacate the PSA did not state she showed Tung all of her agreements with Fou. The court also rejected the claim the 2007 draft will was inadmissible, explaining it was "probative of the approximate quantum of the marital estate, just as the Appellate Division concluded [in the matrimonial action]." The court further found the $500,000 jury award was not inconsistent with the proofs because

there was evidence permitting the jury's estimation of damages with a reasonable degree of certainty, which is sufficient to support a damages award.

Plaintiff's counsel moved for an attorney's fee award for the services provided in prosecuting the malpractice action, together with an "enhancement" of the fees based on the nature of the case and the offer of judgment rule. See R. 4:58-1 to -6. The claimed fees totaled $1,105,624.58, for which plaintiff sought a fifty-percent enhancement, for a total of $1,626,162,58. Defendants opposed the motion. The court issued a letter opinion granting plaintiff's motion in part, entering an order awarding $702,000 in fees based on a lodestar calculation.

The court also issued a July 27, 2018 order barring Tung from transferring assets pending the outcome of an appeal from the judgment, and permitting the ongoing operation of Tung, P.C. The order further required that defendants file a bond and defendants' malpractice carrier pay the policy balance into court.

Defendants sought an amendment of the court's July 27, 2018 order without filing a formal motion. Defendants' proposed amended order included a provision addressing plaintiff's potential double recovery. The provision required that plaintiff provide defendants with semi-annual accountings, through December 31, 2025, of any monies or assets received from Fou. The provision

further required an equal split between plaintiff and defendants of the monies and assets plaintiff received from Fou, with defendants' share of the split credited against any sums due to plaintiff from defendants under the final judgment in the malpractice action.

Plaintiff's counsel opposed the requested amendment to the July 27, 2018 order, but on December 27, 2018, the court entered the proposed amended order including the double-recovery provision defendants had included. Plaintiff moved for reconsideration of the amended order, noting the court erroneously deemed defendants' request for entry of the order unopposed. On January 28, 2019, the court granted the reconsideration motion and entered an order striking the double-recovery provision defendants had proposed. On May 22, 2019, the court denied a motion filed by defendants for reconsideration of the January 28, 2019 order. This appeal followed.

II.

A.

Defendants first contend the court erred by denying their motions to dismiss, for judgment notwithstanding the verdict, and for a new trial, and that the jury's verdict should otherwise be reversed, because plaintiff failed to prove they proximately caused her alleged damages. More particularly, they assert the

27

motions should have been granted for the following reasons: plaintiff failed to prove she suffered damages resulting from the relief in obtaining the alimony and equitable distribution of marital assets provided for in the AFJD because plaintiff failed to present any evidence Fou dissipated any marital assets prior to entry of the AFJD; O'Donnell's testimony did not establish plaintiff suffered any financial damages as a result of defendants' negligence; plaintiff is equitably estopped from claiming damages as a result of any negligence concerning the preparation of the PSA because she testified in the divorce proceeding that the PSA was "fair and equitable" and was entered into following a "full disclosure of all assets"; plaintiff failed to prove she cannot collect the attorney's fees awarded in the matrimonial action and the marital assets and payments due under the AFJD directly from Fou, and, as a result, the verdict in the malpractice case constitutes an impermissible double recovery; and the jury's $500,000 damages award is not supported by the evidence or applicable law.[5]

Our review of defendants' arguments is guided by the following principles.  A jury verdict "is cloaked with a 'presumption of correctness,'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v.

---

[5]  Tung, P.C. and Tung filed separate briefs on appeal.  To the extent their respective arguments are duplicative or complimentary, we discuss them collectively for convenience and to avoid repetition.

Fairmont Food Co., 74 N.J. 588, 598 (1977)), and "is entitled to considerable deference," Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011). We will overturn a jury verdict only if it "is so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality." Maison v. N.J. Transit Corp., 460 N.J. Super. 222, 234 (App. Div. 2019) (quoting Wytupeck v. City of Camden, 25 N.J. 450, 466 (1957)).

Where a party claims a trial court erred by denying a motion for involuntary dismissal, we decide whether the evidence, together with the legitimate inferences that can be drawn from it, sustains a judgment in favor of the party opposing the motion. R. 4:37-2(b). We must accept as true all evidence supporting the position of the party opposing the motion and we accord that party the benefit of all favorable inferences. Dolson v. Anastasia, 55 N.J. 2, 5 (1969).

Similarly, our review of motions for judgment under Rule 4:40-1 and for judgment notwithstanding a verdict under Rule 4:40-2(b) requires that "we apply the same standard that governs the trial courts," Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016); that is, "if, accepting as true all the evidence which supports the position of the party defending against the motion[s] and

according [that party] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion[s] must be denied," ibid. (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)).

Under Rule 4:49-1(a), a trial court shall grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." "An appellate court will not reverse a trial court's determination of a motion for a new trial 'unless it clearly appears that there was a miscarriage of justice under the law.'" Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 572 (2016) (quoting R. 2:10-1). We give "considerable deference to a trial court's decision" on a motion for a new trial because "the trial court has gained a 'feel of the case' through the long days of the trial." Lanzet v. Greenberg, 126 N.J. 168, 175 (1991).

To prove a claim for legal malpractice, a plaintiff must demonstrate "(1) the existence of an attorney-client relationship . . . , (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." Jerista v. Murray, 185 N.J. 175, 190-91 (2005) (quoting McGrogan v. Till, 167 N.J. 414, 425 (2001)). "The burden is on the client to show what injuries were suffered as a proximate consequence of the attorney's breach of

duty." 2175 Lemoine Ave. Corp. v. Finco, Inc., 272 N.J. Super. 478, 487-88 (App. Div. 1994).

To establish proximate causation of damages in a legal malpractice action, the plaintiff "must demonstrate that he or she would have prevailed, or would have won materially more . . . but for the alleged substandard performance." Lerner v. Laufer, 359 N.J. Super. 201, 221 (App. Div. 2003). "The test of proximate cause is satisfied where the negligent conduct is a substantial contributing factor in causing the loss." 2175 Lemoine Ave. Corp., 272 N.J. Super. at 487; see also Froom v. Perel, 377 N.J. Super. 298, 313 (App. Div. 2005) ("To establish the requisite causal connection between a defendant's negligence and plaintiff's harm, plaintiff must present evidence to support a finding that defendant's negligent conduct was a 'substantial factor' in bringing about plaintiff's injury . . . ." (citation omitted)).

"[T]he measure of damages is ordinarily the amount that the client would have received [or would not have had to pay] but for his [or her] attorney's negligence." Gautam v. De Luca, 215 N.J. Super. 388, 397 (App. Div. 1987); see also Conklin v. Hannoch Weisman, 145 N.J. 395, 417 (1996). "[D]amages should be generally limited to recompensing the injured party for his [or her] economic loss." Gautam, 215 N.J. Super. at 399.

31

"[M]ere uncertainty as to the amount of damages will not preclude a recovery even though proof of the amount of damages is inexact. Evidence which affords a basis for estimating damages with some reasonable degree of certainty is sufficient to support an award." Viviano v. CBS, Inc., 251 N.J. Super. 113, 129 (App. Div. 1991) (citation omitted). However, "the 'law abhors damages based on mere speculation,'" Mosley v. Femina Fashions, Inc., 356 N.J. Super. 118, 128 (App. Div. 2002) (quoting Caldwell v. Haynes, 136 N.J. 422, 442 (1994)), and a plaintiff must lay a foundation allowing the factfinder to reach a fair and reasonable estimate of damages with sufficient certainty, id. at 128-29. A legal malpractice plaintiff does not satisfy this burden "by mere 'conjecture, surmise or suspicion.'" 2175 Lemoine Ave. Corp., 272 N.J. Super. at 488 (quoting Long v. Landy, 35 N.J. 44, 54 (1961)). Damages must be proven through "competent credible evidence which proves material facts." Lamb v. Barbour, 188 N.J. Super. 6, 12 (App. Div. 1982).

Defendants' contention plaintiff failed to prove she suffered damages proximately caused by their negligence is founded on the premise that plaintiff did not present evidence she suffered a loss of any marital assets or from a failure to collect payments she would have otherwise received if the terms of the AFJD had been first included in the original judgment of divorce. Defendants claim

plaintiff failed to prove Fou took any action prior to entry of the AFJD that resulted in plaintiff receiving less from him than she would have had the original judgment of divorce included the provisions concerning the division of the business assets and payment of alimony later included in the AFJD.

Defendants' argument ignores the evidence presented at trial, as well as plaintiff's entitlement to recover $449,798.59 for fees and costs she incurred in vacating the PSA and original judgment of divorce and obtaining the AFJD. Accepting the evidence favorable to plaintiff, as well as the reasonable inferences from that evidence, plaintiff's and O'Donnell's testimony established defendants deviated from the standard of care for matrimonial attorneys by: failing to adequately confer with plaintiff about, and verify, the marital and family business assets prior to preparing the PSA and proceeding to judgment in the matrimonial action; failing to properly advise plaintiff concerning her right to an equitable division of the assets; and failing to incorporate the provisions of the February 15, 2009 Divorce Agreement, which allowed for a later division of the marital and family business assets, into the PSA.

O'Donnell and plaintiff further testified that, as a result of defendants' deviations from the applicable standards of care, plaintiff was required to move to vacate the PSA and original judgment of divorce and obtain the AFJD. The

33

evidence showed plaintiff incurred $449,798.59 in attorney's fees and costs to remedy the errors in the PSA and original judgment of divorce resulting from defendants' negligence. Thus, the evidence established plaintiff suffered $449,798.59 in damages as a direct and proximate result of defendants' negligence. See In re Estate of Lash, 169 N.J. 20, 26 (2001) (explaining a plaintiff "forced because of the wrongful conduct of a tortfeasor to institute litigation against a third party . . . can recover the fees incurred in that litigation from the tortfeasor" and finding "[t]hose fees are merely a portion of the damages the plaintiff suffered at the hands of the tortfeasor"); see also Lovett v. Estate of Lovett, 250 N.J. Super. 79, 94 (Ch. Div. 1991) (noting attorney's fees incurred in litigation that are the "'natural and necessary' consequence" of an attorney's negligence are recoverable as damages in a malpractice case against the attorney).

We are therefore convinced plaintiff presented sufficient evidence that the fees and costs she incurred were the direct and proximate result of defendants' negligence, and we affirm the jury's damages award in that amount. For the same reason, we reject defendants' contention the court erred by denying their motions for judgment, a new trial, and judgment notwithstanding the verdict as

to plaintiff's claim she suffered damages in the amount of $449,798.59 as a direct and proximate result of defendants' negligence.

The same cannot be said of the $50,201.41 balance of the jury's $500,000 damages award. The trial record is bereft of any competent evidence plaintiff suffered any actual damages—beyond the fees incurred to vacate the PSA and original judgment of divorce and obtain the AFJD—as a direct and proximate result of defendants' negligence. And, in her brief on appeal, plaintiff points to none. Plaintiff did not present evidence Fou dissipated the marital or business assets following entry of the original judgment of divorce and prior to entry of the AFJD, or that she was damaged or suffered any financial losses as a result of the delay, occasioned by defendants' negligence, in obtaining the relief in the matrimonial matter with the entry of the AFJD.

Relying on O'Donnell's testimony, plaintiff claims she lost "leverage" in the initial matrimonial proceeding as a result of defendants' negligence, and she also contends in a conclusory fashion she was unable to actually collect payments and her share of the marital assets from Fou that she would have otherwise collected had defendants' negligence not delayed her from obtaining the terms later incorporated in the AFJD. Plaintiff's contentions are unsupported by evidence establishing any actual monetary loss, or monetary loss that can be

reasonably approximated, that was directly and proximately caused by defendants' negligence. For example, plaintiff did not present any evidence that had the original judgment of divorce included the same terms as the AFJD, she would have collected more money or recouped more assets from Fou than she otherwise did. As a result, the jury's award of damages in excess of the $449,798.59 in costs and fees she incurred in vacating the PSA and original judgment of divorce and obtaining the AFJD was based on mere speculation and is not supported by evidence.

A jury award that is unsupported by the evidence, see Caldwell, 136 N.J. at 438-40, or is founded on a vague, theoretical damages claim, see McConkey v. Aon Corp., 354 N.J. Super. 25, 63-64 (App. Div. 2002), cannot be sustained. Having carefully reviewed the record, we find no competent evidence supporting the jury's damages award beyond the $449,798.59 in fees incurred by plaintiff in vacating the PSA and original judgment of divorce and obtaining the AFJD, and we vacate the $50,201.41 balance of the $500,000 awarded by the jury. We affirm the jury's damages award in the amount of $449,798.59.

B.

We also reject defendants' claim that plaintiff was equitably or judicially estopped from asserting a malpractice claim. Defendants assert plaintiff should

36

have been estopped from asserting in the malpractice case that the PSA was unfair and did not properly reflect her and Fou's agreement to divide the marital and business assets because she testified during the divorce proceeding that the PSA was "fair and equitable" and was made following a "full disclosure of the assets." Defendants also contend plaintiff made a material omission of fact during the plenary hearing in the Family Part on her motion to vacate the PSA and original judgment of divorce by failing to inform the court she did not show Tung three of the four Chinese agreements when she and Fou met Tung on February 15, 2009.[6]

We find defendants' estoppel arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We add only the following. The doctrine of equitable estoppel prevents a party from repudiating prior "conduct if such repudiation 'would not be responsive to the demands of justice and good conscience.'" Carlsen v. Masters, Mates & Pilots Pension Plan Tr., 80 N.J. 334, 339 (1979) (quoting W. Jersey Title & Guar. Co. v. Indus. Tr. Co., 27 N.J. 144, 153 (1958)). "To establish a claim of equitable estoppel, the claiming party must show that the alleged conduct was done, or representation was made,

---

[6] The three agreements include the two 2007 agreements and the February 15, 2009 Supplemental Divorce Agreement, all of which were written in Chinese and none of which were provided to defendants by plaintiff or Fou.

A-4690-18

intentionally or under such circumstances that it was both natural and probable that it would induce action." Miller v. Miller, 97 N.J. 154, 163 (1984). "Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment." Ibid.

The purpose of the judicial estoppel doctrine is to protect the integrity of the judicial process. Cummings v. Bahr, 295 N.J. Super. 374, 387 (App. Div. 1996). A threat to such integrity arises when a party advocates a position contrary to a position it successfully asserted in the same or a prior proceeding. Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 620 (App. Div. 1990). Such equitable principles, including the doctrine of "unclean hands," are "applicable whenever it appears that the litigant seeks to be relieved of the consequences of a fraud in which he has been an active participant." Prindiville v. Johnson & Higgins, 93 N.J. Eq. 425, 428 (E & A 1922).

Application of these equitable doctrines is not supported by the evidence here. Plaintiff's testimony at the divorce proceeding, that the PSA was fair and the PSA was made following a full disclosure of the marital assets, is not inconsistent with her subsequent claim defendants failed to include the terms of the Divorce Agreement in the PSA. To the contrary, plaintiff testified she did not read the PSA prior to the divorce proceeding, and, during that proceeding,

Tung never asked plaintiff if she reviewed or understood the PSA. Moreover, plaintiff's testimony during the divorce proceeding was premised on her understanding that defendants had done what they were retained to do— incorporate the terms of the Divorce Agreement into the PSA.

There is also no evidence supporting defendants' claim plaintiff misled the Family Part in her application to vacate the PSA by failing to inform the court of the existence of the two 2007 Chinese agreements and the February 15, 2009 Supplemental Divorce Agreement, which was also written in Chinese. Plaintiff's malpractice claim is simply not dependent on those agreements or whether they were ever shown to Tung. Plaintiff acknowledged during her testimony in the malpractice case that those agreements were never shown to Tung. It was defendants' failure to incorporate the February 15, 2009 Divorce Agreement into the PSA and initial judgment of divorce upon which plaintiff's malpractice claim is based. There is no dispute that agreement was disclosed by plaintiff to the Family Part during the proceedings supporting her application to vacate the PSA and the original judgment of divorce.

In sum, defendants' equitable defenses to plaintiff's malpractice claim find no support in the evidence. We reject any claim plaintiff is equitably or judicially estopped from prosecuting her malpractice claim.

A-4690-18

C.

Defendants also contend the final judgment should be reversed because it could result in a double recovery to plaintiff. Defendants contend there is no evidence establishing that plaintiff cannot collect from Fou the sums for attorney's fees awarded to plaintiff by the Family Part for her prosecution of her motion to vacate the PSA and original judgment of divorce, and to obtain the AFJD, and therefore she could not be properly awarded damages for those fees by the jury in the malpractice case.[7] We are not persuaded.

In the first instance, the record shows Fou stopped making alimony payments to plaintiff in 2011 or 2012; Fou relocated to China; the marital business assets, and Fou's assets, are in China; China will not honor a New Jersey judgment or order; and the Family Part issued a warrant for Fou's arrest based on his failure to honor his obligations under AFJD. In addition, the AFJD requires that Fou pay plaintiff $1,100,000, plus a minimum of $18,000 per

---

[7] We observe that the amount of the fees awarded by the Family Part in the various proceedings resulting from plaintiff's efforts to vacate the PSA and original judgment of divorce and obtain the AFJD, including appeals, are not exactly the same as the evidence in the malpractice showed plaintiff incurred during the Family Part proceedings. It is unnecessary that we address the discrepancy because defendants do not challenge plaintiff's testimony during the malpractice trial that she incurred $449,798.59 in fees and costs prosecuting the proceedings in the Family Part and on the appeal from the Family Part's orders.

A-4690-18

annum in alimony, and $229,389.69 in attorney's fees, but the record shows plaintiff has been able to attach only Fou's social security benefits as a source of collecting the enormous sums due. Thus, defendants' claim the evidence does not demonstrate plaintiff's inability to collect the sums due under the AFJD, including the attorney's fee award, is undermined by the record.

We recognize "[i]t is fundamental that no matter under what theories liability may be established, there cannot be any duplication of damages," Ptaszynski v. Atl. Health Sys., Inc., 440 N.J. Super. 24, 39-40 (App. Div. 2015) (quoting P. v. Portadin, 179 N.J. Super. 465, 472 (App. Div. 1981)), but the mere possibility of a double recovery does not require the reversal of the damages award on plaintiff's malpractice claim, see, e.g., Distefano v. Greenstone, 357 N.J. Super. 352, 357 (App. Div. 2003) (explaining the plaintiff could properly receive a $90,000 settlement in an underlying personal injury action without a deduction for the $30,000 fee otherwise due to her former attorney who committed malpractice because "the duplicate recovery, even though a windfall to the plaintiff, is considered the lesser evil to crediting the attorney with an undeserved fee where he has botched the job").

Moreover, the mere fact that plaintiff might recover monies from Fou under the AFJD does not equate to a double recovery by plaintiff of the sums

she will collect from defendants based on the jury's verdict. That is because the damages awarded by the jury in the malpractice case are limited to the attorney's fees and costs incurred by plaintiff in the proceedings to vacate the PSA and original judgment of divorce and obtain the AFJD, and the sums due plaintiff under the AFJD are attributable to equitable distribution ($1,100,000), alimony (minimum $18,000 annually since around 2012), and other sums wholly separate from the AFJD's award of damages based solely on attorney's fees and costs. It is only plaintiff's recovery of attorney's fees from Fou under the AFJD that provides a potential double recovery for the damages—attorney's fees and costs in the proceedings to vacate the PSA and original judgment of divorce and obtain the AFJD—awarded by the jury in the malpractice case. Also, and as noted, plaintiff presented evidence establishing the collection of anything from Fou is unlikely.

Under these circumstances, we discern no basis to reverse the jury's damages award on what appears to be nothing more than an improbable and theoretical possibility plaintiff might recover some of what is owed to her from Fou under the AFJD, including a double recovery of the attorney's fees and costs for which the jury awarded her damages in the malpractice case. As a result, we

42

affirm the jury's damages award against defendants, as modified by our decision, in the amount of $449,798.59.

The record shows that in December 2018, defendants submitted a proposed order to the court purportedly amending a July 27, 2018 order that, in part, limited defendants from transferring assets and required them to file a bond. Defendants' submission of the amended order was untethered to any motion filings, and the order appears to have been submitted as the result of discussions between the parties concerning issues related to the judgment and defendants' disposition of their assets. According to plaintiff's counsel, defendants submitted the order to the court with a representation there was no objection to its entry.

The order included a provision, proposed by defendants, putatively addressing the double recovery issue.[8] In pertinent part, the provision required that plaintiff supply defendants with semi-annual accountings of monies received from Fou through December 31, 2025, and directed that any monies plaintiff collected from Fou be evenly split between plaintiff and defendants

---

[8] The December 27, 2018 order also addressed other issues not pertinent to this appeal.

A-4690-18

"[t]o ensure there is no double recovery." The court entered the amended order on December 27, 2018.

Plaintiff moved for reconsideration of the order. As the court explained in detail in its subsequent written decision, it entered the December 27, 2018 order solely based on an erroneous assumption plaintiff consented to the double-recovery provision when, in fact, plaintiff had not consented and her counsel had properly filed an objection to the provision's inclusion in the order. The court granted plaintiff's motion for reconsideration based solely on its error, and entered a January 28, 2019 order amending the December 27, 2018 order by deleting the putative double-recovery provision.

In its written decision on the motion for reconsideration of the December 27, 2018 order, the court noted defendants had not made a formal motion seeking the relief afforded by the putative double-recovery provision—an accounting of plaintiff's receipt of funds from Fou as a vehicle to ensure there is no double recovery. The court further stated counsel for defendants could apply for the relief "by filing a motion in the ordinary course."

Defendants declined the court's invitation. Defendants never filed a motion seeking an order providing for periodic accountings of monies received

A-4690-18

by plaintiff from Fou to permit an assessment of whether plaintiff obtained a double recovery and to provide an appropriate remedy for any double recovery.[9]

Defendants' failure to file a motion seeking the relief set forth in the proposed double-recovery provision deprived plaintiff the opportunity to respond, and the motion court of an opportunity to address the merits of the proposed double-recovery provision in the first instance. "An application to the court for an order shall be made by motion," R. 1:6-2(a), not a letter. Defendants' contention the court erred by failing to include the relief in the proposed provision is tantamount to making its motion for an order including a double-recovery provision for the first time on appeal. We reject defendant's belated effort. Defendants' newfound arguments on their claimed entitlement to an order addressing plaintiff's purported potential double recovery do not go to the court's jurisdiction or involve a matter of public interest, and, therefore, we will not consider the arguments for the first time on appeal. Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973).

---

[9] The certification of counsel supporting defendants' motion for reconsideration generally requested that the court reconsider its decision to eliminate the double-recovery provision that defendants included in the December 27, 2018 order, but the certification offered no facts supporting the request.

We do, however, affirm the court's January 28, 2019 order amending the December 27, 2018 order because, as the court detailed in its written decision, it entered the December 27, 2018 order based solely on the mistaken understanding the order was not opposed by plaintiff. We find no error in that determination, and defendants do not claim the court erred by reconsidering the December 27, 2018 order for that reason. We affirm the court's May 22, 2019 order denying defendants' motion for reconsideration of the January 28, 2019 order on the same basis.

D.

Defendants next claim the court erred in its award of counsel fees to plaintiff. Defendants do not dispute plaintiff is entitled to a counsel fee award based on her successful prosecution of her malpractice claim against them. As the Court explained in Saffer v. Willoughby, "a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice action." 143 N.J. 256, 272 (1996); see also Bailey v. Pocaro & Pocaro, 305 N.J. Super. 1, 6 (App. Div. 1997).

Defendants argue only that the court erred by calculating the amount of fees and costs because plaintiff's retainer agreement with her counsel provided for a contingent fee, and the court awarded fees exceeding those that would have

been due under the contingency fee arrangement by basing its award on a lodestar calculation.[10] Attorney "fee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (citation omitted). An abuse of discretion occurs "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012) (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007)). We find no abuse of discretion here.

Defendants' argument the court erred by awarding attorney's fees and costs in excess of the amount to which plaintiff's counsel was entitled under its contingent fee arrangement with plaintiff ignores that "[t]here is a significant, material difference between an award of counsel fees under a fee-shifting statute, court rule, or contractual provision, and a fee dispute between a client and [his or] her own attorney." Lucas v. 1 on 1 Title Agency, Inc., 460 N.J. Super. 532, 539 (App. Div. 2019). Thus, "a 'client who has retained an attorney and promised to pay him [or her] stands on a completely different footing from

_____

[10] Plaintiff argues the court erred in its calculation of the attorney fee award and, as a result, the award was too low. We do not address the argument because plaintiff did not cross-appeal from the fee award.

the recipient of a fee-shifting allowance,'" ibid. (quoting Gruhin & Gruhin, P.A. v. Brown, 338 N.J. Super. 276, 281 (App. Div. 2001)), "and the amount a plaintiff seeks to recover under fee shifting is separate and distinct from the amount the plaintiff owes [his or] her attorney," id. at 539-40.

In Rendine v. Pantzer, the Court did not limit the plaintiffs' entitlement to attorney's fees under the fee-shifting provision of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -50, to the agreed-upon contingency fee in the plaintiffs' retainer agreement with their counsel. 141 N.J. 292, 317, 344-46 (1995). To the contrary, the Court allowed for the enhancement of attorney's fees otherwise due under a contingency fee agreement between a plaintiff and his or her counsel based on a lodestar calculation and a consideration of various other factors including, for example, the risk of nonpayment for services provided under a contingency fee arrangement. Id. at 337-41. The Court further explained that under a fee-shifting paradigm, the first step in determining the appropriate fee award is the calculation of the lodestar, which consists of the hours reasonably expended by counsel multiplied by a reasonable hourly rate. Id. at 316; see also Packard-Bamberger, 167 N.J. at 445. A court must then "consider whether to increase that fee to reflect the risk of nonpayment in all

cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome."  Rendine, 141 N.J. at 337.

Defendants rely on our decision in Distefano, where we affirmed the trial court's rejection of the successful plaintiff's claim in a malpractice case for a $48,250 fee based on a lodestar calculation in favor of a $30,000 fee under the contingent fee agreement with the plaintiff's counsel.  357 N.J. Super. at 360-61.  In Distefano, however, we cited Rendine and explained that "[c]ourts usually use [the lodestar calculation] method in setting fee awards in . . . fee[-]shifting contexts."  Id. at 361.  We also noted the plaintiff's attorneys did not apply "for an enhanced contingent fee."  Ibid.  Without any further analysis, we found "no need to resort to a lodestar methodology" because the plaintiff's attorneys in the underlying matter and malpractice case each "agreed to a one-third contingent fee," and those agreements "insured appropriate compensation." Ibid.

We find Distefano inapposite.  Here, plaintiff applied for an enhanced contingent fee, and Rendine requires calculation of the lodestar in a fee-shifting case where such an application is made.  See Rendine, 141 N.J. at 334-45 (explaining standards for a fee application in a fee-shifting case).

Defendants do not otherwise challenge the court's thoughtful and detailed analysis and determination of the lodestar, or its calculation of the attorney's fee award based on the pertinent factors required by Rendine and R.P.C. 1.5. We affirm the attorney's fee award substantially for the reasons set forth in the court's written opinion.

We note the court awarded attorney's fees to plaintiff as a successful litigant in the legal malpractice action under the principles established in Saffer and also based on the offer of judgment rule, R. 4:58-1 to -6. The court also awarded interest on the attorneys' fees awarded in accordance with Rule 4:58-2(a). Our determination the damages award must be reduced to $449,798.59 renders the relief available under the offer of judgment rule inapplicable because plaintiff offered to accept judgment in the amount of $400,000, and the reduced damages award of $449,798.59 is less than 120 percent of the offer of judgment. See R. 4:58-2(a) (providing for recovery of reasonable litigation expenses and reasonable attorney's fees where the money judgment obtained is 120 percent or more of the amount of the offer of judgment). Thus, on the remand for entry of a new judgment, the court shall vacate the award of interest per Rule 4:58-2(a) and determine such interest as is otherwise appropriate under the Rules of Court.

A-4690-18

E.

Tung separately makes a series of arguments directed to what he contends are insufficiencies of plaintiff's evidence and the court's erroneous admission of evidence. We briefly address the arguments in turn.

Tung contends his failure to incorporate provisions from the agreements written in Chinese into the PSA did not proximately cause any damages to plaintiff because the agreements were invalid, the Family Part found the agreements were unenforceable, and plaintiff therefore could not have recovered anything under them. We reject the argument because plaintiff's negligence claim is not based on the validity of the Chinese agreements or on an alleged inability to enforce them following entry into the PSA. O'Donnell testified that, independent of the agreements, defendants negligently failed to inquire about plaintiff's and Fou's marital and business assets in their representation of plaintiff and preparation of the PSA. Moreover, as noted, plaintiff testified Tung was given the Divorce Agreement for the purpose of incorporating its terms into the PSA, and those terms included plaintiff and Fou's agreement to later divide property and business assets. Tung cites to no legal authority establishing those terms would have been unenforceable if incorporated into the PSA, and, as plaintiff demonstrated in the Family Part proceeding, but for Tung's failure to

include those terms in the PSA, plaintiff would not have suffered damages by incurring the expenses to vacate the PSA and original judgment of divorce and obtain the AFJD. See Conklin, 145 N.J. at 417 (explaining proximate cause is established by showing a plaintiff's damages would not have occurred "but for" the defendant's negligence (citation omitted)). Tung's failure to incorporate those terms and inquire about the status of the marital and business assets referenced in the Divorce Agreement support a finding his negligence caused plaintiff's damages.

Tung also argues the court erred by denying his motion in limine to bar evidence concerning Fou's will that plaintiff found on a computer in 2007. Tung contends plaintiff would not have been able to prove her alleged damages without the admission of the will, which revealed $2,200,000 in marital assets. We review a court's decision to admit evidence for an abuse of discretion, Estate of Hanges v. Metro. Prop. & Cas. Ins., 202 N.J. 369, 383-84 (2010), but the court's decision denying defendants' motion in limine is untethered to a citation to any legal authority supporting the admission of the will. We need not address the merits of the court's decision to permit testimony concerning the will, however, because the testimony, if accepted, established only that plaintiff and Fou had assets totaling $2,200,000 in 2007, and, prior to the malpractice case,

the Family Part decided as a matter of fact and law that plaintiff and Fou shared assets valued in that amount, and entered the AFJD granting plaintiff one-half of that amount in equitable distribution. The AFJD was admitted in evidence in the malpractice case and it showed the Family Part's division of the marital assets. Thus, the admission of the testimony concerning Fou's will was merely cumulative and harmless. Additionally, plaintiff's damages award, as modified by our decision, does not include any amounts for any claimed loss of marital assets due to defendants' negligence. Thus, even if the will was admitted in error, it does not require or permit a reversal of the court's final judgment. See R. 2:10-2.

Tung also claims plaintiff's resolution of Medicaid's claim for reimbursement of her benefits constitutes "an unimpeached guilty plea in a criminal proceeding [that] bars recovery in a legal malpractice action." We reject the claim in the first instance for the simple, but dispositive, reason that plaintiff was never charged with a criminal offense related to her collection of Medicaid benefits and there is no evidence she ever pleaded guilty to anything. Moreover, Tung's claim, that our decision in Alampi v. Russo, 345 N.J. Super. 360 (App. Div. 2001), stands for the broad proposition that a plaintiff who pleads guilty to a criminal offense may not assert a legal malpractice claim against his

or her lawyer, is frivolous. We need not distinguish the facts and circumstances in <u>Alampi</u> from those extant here other than to note that no reasoned reading of the case permits a supportable argument that it stands for the proposition asserted by Tung. His claims to the contrary do not merit any further discussion. <u>R.</u> 2:11-3(e)(1)(E).

Tung further argues the court erred by admitting the Family Part's decision on plaintiff's motion to vacate the PSA and the original judgment of divorce, and our decision affirming the Family Part's order. Tung generally argues he was not a party to those proceedings and the admission of those documents resulted in a denial of due process as to him and a "fraud upon the court." We find no merit to Tung's arguments. The court did not abuse its discretion by admitting the opinions as evidence of the proceedings in the Family Part that were required to obtain relief from the PSA and original judgment of divorce that were entered as a result of Tung's negligence. Pursuant to defendants' request, the trial court redacted the opinions to eliminate any findings concerning, or references to, defendants' negligence. Tung makes no showing the court abused its discretion in admitting the redacted opinions, and he also fails to demonstrate that, even if they were entered in error, their admission was clearly capable of producing an unjust result. <u>R.</u> 2:10-2. Nor could he

demonstrate prejudice because the testimonial evidence otherwise established plaintiff successfully moved to vacate the PSA and original judgment of divorce and obtained the AFJD in the Family Part, and that those proceedings were required because Tung negligently failed to obtain for plaintiff that to which she was entitled when he represented her in the divorce proceeding.

Tung also argues for a reversal of the jury's verdict and the court's orders denying the motions for judgment, for judgment notwithstanding the verdict, and for a new trial, because the court erred by sustaining plaintiff's objections to the admission of attorney-client communications and work product documents that were inadvertently turned over during discovery; providing purported erroneous mid-trial instructions to the jury concerning "negligence" and "discovery"; and permitting the reading of portions of his deposition testimony to the jury. We find each of the arguments lack sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), except we note the arguments are not supported by the facts or applicable law, and Tung fails to demonstrate that any of the purported errors were clearly capable of producing an unjust result, R. 2:10-2.

In sum, we affirm the court's orders denying defendants' motions for judgment, for judgment notwithstanding the verdict, and for a new trial. We

also affirm the court's January 28, 2019 order granting plaintiff's motion for reconsideration of the December 27, 2018 order, and we affirm the court's May 22, 2019 order denying defendants' motion for reconsideration of the January 28, 2019 order. We vacate that portion of the final judgment awarding plaintiff $500,000 in damages, and awarding plaintiff interest pursuant to Rule 4:58 on the attorney's fee award, and otherwise affirm the other provisions of the judgment. We remand for the court to enter a revised judgment awarding plaintiff $449,798.59 in damages and providing for interest on the attorney's fee award in accordance with the Rules of Court.

Any arguments we have not directly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

56

A-4690-18